Filed 3/9/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G059322 |
| v. | (Super. Ct. No. 15WF1446) |
| JOHN RAMON BRECEDA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Sheila F. Hanson, Judge.  Affirmed.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael T. Murphy and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

"Jury trial began in March 2020"—ominous words for a court of review.

This is the first case in California where a state appellate court must decide whether a pause in a criminal jury trial due to the coronavirus disease 2019 (COVID-19) pandemic violated an accused's due process right to a fair trial.

In this case, the prosecution nearly completed its case-in-chief against John Ramon Breceda when the trial court paused proceedings on March 16, 2020, because three of the 14 jurors were ill. Breceda refused to waive time and refused to proceed with 11 jurors. The trial court denied his motion for a mistrial and continued the case.

Beginning that day, and for months after, the COVID-19 pandemic caused California officials to issue a flurry of orders to continue to provide essential government services, safeguard constitutional rights, and protect people from a mysterious, contagious, and deadly virus. The effect of some of those orders was jury trials could not proceed.

Seventy-two days after the trial court paused proceedings, the court denied Breceda's second motion for a mistrial. Trial resumed the following day. The prosecution completed its case-in-chief, and Breceda testified. The jury acquitted Breceda of first degree murder but convicted him of second degree murder and arson of another's property.

Breceda argues the trial court erred by denying his mistrial motions because the pause in his jury trial due to the COVID-19 pandemic violated his due process right to a fair trial.[1] We disagree.

Although the pause in the trial was lengthy, 10 weeks, Breceda's constitutional rights were not set aside and forgotten. (See *Roman Catholic Diocese of Brooklyn v. Cuomo* (2020) ___ U.S. ___ [141 S.Ct. 63, 68] ["But even in a pandemic, the

---

[1] Breceda notes he is not asserting he was denied his right to a speedy trial.

Constitution cannot be put away and forgotten"].)  On the contrary, the record demonstrates the court remained appropriately focused on Breceda's constitutional rights during the onset of an unprecedented global health crisis.  We affirm the judgment.

<div align="center">FACTS</div>

In 2015, Breceda fatally stabbed Floriberto Villaseñor in the neck.  The only issue at trial was whether Breceda did it intentionally or acted in self-defense.  The jury resolved that issue against Breceda.

*I.  Pretrial*

A 2016 information charged Breceda with murder (Pen. Code, § 187, subd. (a),[2] count 1), and arson of another's property (§ 451, subd. (d), count 2).  The information alleged Breceda personally used a deadly weapon.  (§ 12022, subd. (b)(1).)  The information also alleged Breceda suffered a prior serious and violent conviction (§§ 667, subds. (d), (e)(1), 1170.12, (b), (c)(1)), and a prior prison term (§ 667.5, subd. (b)).[3]

After numerous pretrial motions and replacement of the assigned prosecutor, the matter was progressing toward trial in early 2020.  Then the novel coronavirus upended our lives.

On February 26, 2020, the County of Orange declared a local health emergency to prepare for the COVID-19 outbreak and requested Governor Gavin Newsom to declare a state of emergency.[4]

---

[2]     All further statutory references are to the Penal Code.

[3]     The prosecution filed an amended information to correct count 2's offense date.

[4]     <https://occovid19.ochealthinfo.com/sites/virus/files/2020-03/1.%2002.26.20%20COVID-19%20Emergency%20Press%20Release%20and%20 Declarations.pdf> (as of Mar. 9, 2022).  On the court's own motion and for good cause, we take judicial notice of the various official acts referenced in this decision.  (Evid. Code, § 452, subd. (c).)

<div align="center">3</div>

On March 4, 2020, the trial court empaneled the jury. That same day, the Governor declared a state of emergency due to the global COVID-19 outbreak.[5] Witness testimony began the following day on March 5, 2020.

## II. Trial

### A. March 5, 2020—Thursday

On the first day of testimony, the prosecution called a witness, an emergency responder, a forensic pathologist, and the lead detective, Michelle Bradbury. The evidence demonstrated that around 4:30 p.m., 44-year-old Villaseñor was running on a sidewalk holding his hand to his neck and asking for help. Villaseñor collapsed on the witness's front yard, and the witness called 911. Emergency responders arrived, treated Villaseñor's neck laceration, and transported him to the hospital—he died en route. Villaseñor had on his person $1,806 in cash, 14.9 grams of methamphetamine, and a motel key card.

Police officers found a broken taillight and sun visor on the ground. Officers went to the motel and learned Maricela Lee registered for the room that corresponded to the motel key card. Motel surveillance video showed Villaseñor, Maricela Gomez-Lee, Breceda, and an unknown male entering and exiting the motel room the morning of the stabbing. The video showed Villaseñor holding a cooler entering and exiting the room.

A little later, officers spotted Gomez-Lee's car, stopped her, spoke with her, and covertly placed a tracking device on her car. Two days after the incident, officers found Villaseñor's burned car in San Juan Capistrano, California. There was a cooler in the trunk.

Villaseñor suffered a three and one-half inch long and four-inch deep laceration to the right side of his neck. A sharp cutting instrument severed the right

---

[5] &lt;https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf&gt; (as of Mar. 9, 2022).

4

carotid artery and jugular vein. Villaseñor had no defensive wounds, but he did have methamphetamine and amphetamine in his system.

Forensic testing connected Breceda to the sun visor, and officers arrested him. A few weeks later, officers tracked Gomez-Lee to a residence in Lake Elsinore, California. They interviewed her, arrested her, and transported her to the police station where they interviewed her again.

B. *March 9, 2020—Monday*

Gomez-Lee and her friend Sally S. testified for the prosecution. Gomez-Lee was charged with being an accessory after the fact and arson of another's property for her role in Villaseñor's death; she testified pursuant to a grant of use immunity. She and Breceda were romantically involved before he went into custody, and when he was released, they resumed their friendship.

Early on the morning of the incident, Breceda, who was with Villaseñor and the unnamed man, asked Gomez-Lee to rent a motel room for Villaseñor. After she rented the motel room, the four went to the room; she and Breceda smoked methamphetamine. Later that morning, Villaseñor and Breceda left in Villaseñor's car, Gomez-Lee left in her car, and the unnamed man left in his vehicle.

Around noon, Breceda called Gomez-Lee and asked her to pick him up on Peppertree Lane. When she arrived, she saw Villaseñor asleep in his car and picked up Breceda nearby. He was frustrated because the man that he and Villaseñor were waiting for did not arrive and he felt Villaseñor was wasting his time. Gomez-Lee and Breceda drove around smoking methamphetamine. Breceda told her that he needed a knife to open packages so she drove to a grocery store. Inside the store, she picked up a box cutter but Breceda said it was not sharp enough to cut the thick wrapping. Gomez-Lee stole a knife with a two to three-inch blade and gave it to Breceda.

5

In the car, Breceda told Gomez-Lee to take him back to Peppertree Lane. Gomez-Lee dropped him off near Villaseñor's car. Gomez-Lee drove to a nearby gas station where she eventually sold her jumper cables to buy gas.

About an hour later, she noticed police activity in the area where she had dropped off Breceda and drove back to the area but did not see Villaseñor's car. Her cell phone was dead, and she went to a store and stole a charger. When her phone charged, Breceda called her and told her "shit went down" and to meet him at the Tustin Marketplace because he needed his backpack, which he had left in her car.

When she arrived, Breceda was alone and driving Villaseñor's car. He said, "It's all bad" and left.

After midnight, Breceda called Gomez-Lee and asked her to meet him at the Tustin Marketplace. When she arrived, Breceda was alone and driving Villaseñor's car. Gomez-Lee followed Breceda south on the I-5 freeway to a field. Breceda parked Villaseñor's car, poured gas on it, and lit it on fire. Breceda told Gomez-Lee that he needed to get rid of the car. As Gomez-Lee drove Breceda home, she asked him what had happened. Breceda told her "shit went down" and "to keep [her] fucking mouth shut." She saw Breceda again a couple of times before going to stay with her friend Sally in Lake Elsinore.

Gomez-Lee admitted she did not tell police officers about stealing the knife when they interviewed her at the police station. She did not mention it until agreeing to testify and receiving immunity. Gomez-Lee admitted she suffered two felony convictions for receiving stolen property.

Cross-examination of Gomez-Lee paused to allow Sally to testify. Sally testified she and Gomez-Lee smoked methamphetamine, and Gomez-Lee told her "something went wrong" and she and Breceda lit a car on fire. Sally did not recall telling police that Gomez-Lee told her the knife was in the car they set ablaze. Sally agreed she

told police that Gomez-Lee said Breceda went to collect money, something went wrong, and a person had been stabbed.

Cross-examination of Gomez-Lee resumed. Gomez-Lee met Breceda through her ex-husband, who was a drug dealer; Breceda was his "muscle," collecting money for him. She knew Breceda collected drug debts and sold drugs occasionally. The trial court recessed for the day.

C. *March 10, 2020—Tuesday*

Cross-examination of Gomez-Lee resumed. Gomez-Lee agreed she did not mention the knife until she received immunity. On redirect examination, she stated Breceda never claimed he acted in self-defense.

The prosecution also offered the testimony of the deputy sheriff who responded to the call regarding Villaseñor's burning car, the motel manager who produced the surveillance video, and another witness to what transpired on Peppertree Lane.

This witness was outside with his children when he heard someone yell, "Hey, hey." He saw one man chasing another man. He saw the man who was being pursued, who he identified as Breceda, get into a car, start the car, put it into reverse, and crash into another car. The other man tried to open the passenger side door, but Breceda drove away. When shown photographs, the witness identified Timothy Murphy as living in the neighborhood.

D. *March 11, 2020—Wednesday*

On the fourth day of testimony, the prosecutor offered three more witnesses, Villaseñor's girlfriend (Girlfriend), a crime scene investigator, and a fire investigator. One witness was Eugene Nott.

Nott lived on Peppertree Lane and rented a room to Timothy Murphy. Nott testified Murphy was a drug dealer, and Villaseñor regularly visited the apartment to collect money from Murphy. On the day of the incident, Murphy was not home. Nott

7

believed Murphy owed Villaseñor money. That afternoon, Nott heard someone yell, "Stop. Don't go anywhere" or something similar. He looked out of his window and saw a person walking on the sidewalk and collapse; later he learned it was Villaseñor. Nott saw a man start a car and drive away leaving a sun visor on the ground. Earlier that day, Nott saw the car parked on the street positioned so a person could see if Murphy came home. Nott admitted he suffered prior convictions, including for possessing drugs for sales.

Girlfriend testified she knew Murphy. After her recollection was refreshed, Girlfriend stated she told police officers Villaseñor sold drugs to Murphy and Murphy also sold drugs. She also told officers Murphy owed Villaseñor money. She added Villaseñor collected martial arts swords and Murphy had swords.

On March 11, the World Health Organization (WHO) declared COVID-19 a pandemic.[6]

*E. March 12, 2020—Thursday*

The prosecution offered the testimony of a forensic scientist, a police officer, Bradbury, and Detective Jose Morales.

Morales testified he interviewed Sally in Lake Elsinore. Sally stated Gomez-Lee told her that Breceda went to collect money from someone and "[i]t went wrong." She added they were supposed to "beat . . . up" the person, but they stabbed him and killed him. Gomez-Lee told her that she and Breceda lit a car on fire and pushed it down a hill. Gomez-Lee told her they put the knife in the car. The trial court recessed for the day, reminded the jury the court was dark on Friday, and stated proceedings would resume on Monday.

---

[6]    <https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020> (as of Mar. 9, 2022).

The next morning, former President Donald Trump declared a national emergency concerning the COVID-19 outbreak.[7]

*F. March 16, 2020—Monday*

Proceedings did not resume on Monday. The trial court stated two jurors were absent because they were ill. The court explained "[w]e are in the midst" of the COVID-19 pandemic and recited guidance from the Centers for Disease Control and Prevention (CDC), the California Department of Public Health, and the Orange County Health Care Agency. That guidance included canceling mass gatherings to slow community transmission to protect the most at-risk people, including those 65 years old and older or those with serious chronic medical conditions. The court noted six jurors were older than 65 years old and two older than 60. The court stated another juror was coughing and inquired of counsel whether they objected to sending that juror home; neither counsel objected.

The trial court stated only 11 jurors were remaining and its preference was to declare a four-week recess. Breceda's trial counsel (Counsel) consulted with Breceda and said he did not want to waive time and wanted to proceed with the trial. The court asked Counsel whether Breceda would stipulate to less than 12 jurors. Counsel said, "No, he is not." When the court asked how Breceda wanted to proceed, Counsel moved for a mistrial. The court stated it intended to declare a recess. Counsel objected because of the uncertainty of when the trial would resume, juror availability, and the "ramifications" of asking jurors over 60 years old to return. He specified a lengthy delay would cause jurors to forget the evidence and increase the possibility they would discuss the case and conduct inappropriate research. After the court noted Counsel's position

---

7            <https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak> (as of Mar. 9, 2022).

was inconsistent, he and Breceda repeated his request for a mistrial.  The prosecutor objected to granting a mistrial.

The trial court opined resolution of the matter would be quicker if the court delayed proceedings rather than beginning again.  The court explained it wanted to preserve Breceda's speedy trial rights and protect the jurors' health.  The court took a short recess to consider the matter.

When the trial court returned, it denied without prejudice Breceda's mistrial motion because a mistrial was unnecessary to preserve Breceda's due process rights.  The court said that "if circumstances change in the future" Breceda could renew his motion. The court reasoned that because there were only 11 jurors and Breceda would not stipulate to less than 12 jurors, it would continue the matter.  The court noted that if someone contracted the coronavirus, "[t]he recommendation [was] a quarantine of 14 days."  The court placed the jurors on a one-day call and ordered them back on April 6, 2020.  The court admonished the jury to not form any opinions about the evidence, discuss the case or the evidence, conduct any independent research, or read or listen to any news reports about the case.  The court ruled good cause existed to recess the matter until April 6, 2020.  The court ordered counsel and Breceda to appear the next morning or the next day courts were open.

G. *COVID-19 Emergency Orders & Trial Court Proceedings*

On March 16, 2020, the same day the court continued the case, Chief Justice Tani Cantil-Sakauye, acting in her capacity as Chairperson of the Judicial Council of California (Judicial Council), issued an order upon the request of Superior Court of Orange County Presiding Judge Kirk Nakamura authorizing that court to declare March 17, 2020 to March 27, 2020, holidays for purposes of computing time under numerous

10

statutes.[8]  The following day, the presiding judge issued an emergency order declaring those dates holidays.[9]

On March 19, 2020, the Governor issued Executive Order N-33-20, requiring all Californians to stay home but identified courts as essential and exempted workers who support the courts from the order.[10]  The following day, the Chief Justice sent an "advisory" to the superior courts "to provide guidance on ways that might mitigate some of the health risks to judicial officers, court staff, and court users" during the COVID-19 pandemic.[11]  The advisory noted the Governor's shelter in place order was "not meant to close our courts" because the courts are "considered as an essential service."  The Chief Justice continued, "I recognize, however, that this new adjustment to health guidelines and direction likely may require further temporary adjustment or suspension of certain court operations, keeping in mind . . . we are balancing constitutional rights of due process with the safety and health of all court users and employees."  The Chief Justice "strongly encourage[d]" superior courts to consider specified measures that could "be taken immediately to protect constitutional and due process rights of court users."

On March 23, 2020, the Chief Justice issued an order pursuant to Government Code section 68115 explaining courts could not continue to operate and

---

8                       <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Orange%25203.16.20.pdf> (as of Mar. 9, 2022).

9                       <https://www.occourts.org/media-relations/covid/Signed_COVID-19_Pandemic_Order_3_16_20.pdf> (as of Mar 9, 2022).

10                      <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-attested-EO-N-33-20-COVID-19-HEALTH-ORDER.pdf> (as of Mar. 9, 2022).

11                      <https://newsroom.courts.ca.gov/sites/default/files/newsroom/2020-12/Chief-Justice-Advisory-on-COVID-19-and-Court-Operations%20%281%29_0.pdf> (as of Mar. 9, 2022).

comply with the increasingly stringent social distancing measures. She ordered, inter alia, all jury trials suspended for 60 days.[12] The order stated in part as follows: "Courts cannot comply with these health restrictions and continue to operate as they have in the past. Court proceedings require gatherings of court staff, litigants, attorneys, witnesses, and juries, well in excess of the numbers allowed for gathering under current executive and health orders. Many court facilities in California are ill-equipped to effectively allow the social distancing and other public health requirements required to protect people involved in court proceedings and prevent the further spread of COVID-19. Even if court facilities could allow for sufficient social distancing, the closure of schools means that many court employees, litigants, witnesses, and potential jurors cannot leave their homes to attend court proceedings because they must stay home to supervise their children. These restrictions have also made it nearly impossible for courts to assemble juries."

On March 26, 2020, the Chief Justice issued an order authorizing the Superior Court of Orange County to declare March 30, 2020 to April 24, 2020, holidays for purposes of computing time under numerous statutes.[13] The following day, the presiding judge issued an order extending the time for purposes of computing time under numerous statutes from March 30, 2020 to April 24, 2020.[14] The same day, the

---

[12]     <https://newsroom.courts.ca.gov/sites/default/files/newsroom/2020-09/Statewide%20Order%20by%20the%20Chief%20Justice-Chair%20of%20the%20Judicial%20Council%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.pdf> (as of Mar. 9, 2022).

[13]     <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/032620.Orange.SIGNED%2520Supp%2520Emergency%2520Order.pdf> (as of Mar. 9, 2022).

[14]     <https://www.occourts.org/media-relations/covid/Supp_Trial_court_Impl_Emerg_Order_COVID-19_032720.pdf> (as of Mar. 9, 2022).

Governor issued Executive Order No. N-38-20 giving the Judicial Council emergency authority to take action to maintain safe and orderly court operations.[15]

On March 30, 2020, the Chief Justice issued an order authorizing superior courts to extend statutory deadlines and use available technology to conduct remote judicial proceedings.[16]  The order stated in part as follows:  "The continuous operation of our courts is essential for our constitutional form of government, for providing due process and protecting the public.  However, courts are clearly places with high risks during this pandemic because they require gatherings of judicial officers, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries—well in excess of the numbers allowed for gathering under current executive and health orders."

On April 1, 2020, the presiding judge issued an order extending statutory deadlines, clarified the date from which the 60-day jury trial continuance was to be calculated, and to use available technology to conduct remote judicial proceedings.[17]  The next day, the trial court issued a minute order that relied on the numerous orders described above to conclude there was good cause to continue Breceda's jury trial to April 28, 2020.  That same day, the presiding judge issued Administrative Order No. 20/11 establishing the procedures to determine whether good cause existed to conduct jury trials during the 60-day jury trial suspension.[18]

---

[15]       <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.27.20-N-38-20.pdf> (as of Mar. 9, 2022).

[16]       <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/ Statewide%2520Order%2520by%2520the%2520Chief%2520Justice-Chair%2520of% 2520the%2520Judicial%2520Council%25203-30-2020.pdf> (as of Mar. 9, 2022).

[17]       <https://www.occourts.org/media-relations/covid/Supp_Trial_court_Impl_ Emerg_Order_COVID-19_040120.pdf> (as of Mar. 9, 2022).

[18]       <https://www.occourts.org/media-relations/covid/20_11_AdminOrderGood CauseJuryTrial.pdf> (as of Mar. 9, 2022).

On April 24, 2020, the Chief Justice issued an order authorizing the Superior Court of Orange County to declare April 27, 2020 to May 22, 2020, holidays for purposes of computing time under numerous statutes.[19]  The same day, the presiding judge issued an amended order declaring those dates holidays.[20]

On April 28, 2020, Breceda filed a motion for a mistrial and a motion to dismiss for violation of speedy trial rights.  In his mistrial motion, Breceda argued the delay interrupted the trial flow, the evidence was stale in the jurors' minds, and jurors may have engaged in prohibited research and discussions.  In a minute order that day, the trial court relied on the Chief Justice's and the presiding judge's orders to conclude there was good cause to continue Breceda's jury trial to May 26, 2020.

On April 29, 2020, the Chief Justice issued an order extending the jury trial suspension from 60 to 90 days.[21]  The order stated in part as follows:  "[C]ourts are clearly places of high risks during this pandemic because they require gatherings of judicial officers, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries—well in excess of the numbers allowed for gathering under current executive and health orders."

The effect of these orders was the Superior Court of Orange County was closed to the public and handling only time-sensitive matters from March 17, 2020 to May 22, 2020, because of the COVID-19 pandemic.  Breceda did not file a motion to

---

[19]      <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/ Signed%2520EO%2520-%2520Orange%2520renewed%2520COR.pdf> (as of Mar. 9, 2022).

[20]      <https://www.occourts.org/media-relations/covid/Third_Trial_court_ Implementation_Emergency_Order_COVD-19_-_4.23.pdf> (as of Mar. 9, 2022).

[21]      <https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/ Chief_Justice_Statewide_Emergency-Order_04292020S.pdf> (as of Mar. 9, 2022).

14

determine whether good cause existed to resume his jury trial during this time pursuant to the presiding judge's Administrative Order No. 20/11.

*H. May 26, 2020—Tuesday*

Seventy-two days later, proceedings resumed outside of the jury's presence. The trial court detailed the COVID-19 safety measures and the courtroom modifications to protect court users. The court explained the measures it took to ensure there was public access to the proceedings. The court listed the various orders from the Chief Justice, the presiding judge, and the Governor and took judicial notice of them without objection.

The trial court noted the clerk advised the jurors the trial would resume the following day and inquired whether each juror was willing to return. The court said 13 of the 14 jurors would return. The court detailed how the trial would proceed logistically while adhering to COVID-19 safety measures.

The trial court addressed Breceda's pending motions. Counsel argued, and the court denied Breceda's motion to dismiss for violation of speedy trial rights. Citing to the WHO, the CDC, and the orders detailed above, the court explained the delay was reasonable given the unprecedented COVID-19 pandemic. The court opined Breceda was not prejudiced because lengthy trials are common and jurors routinely remember testimony, which the court was confident jurors could do that in this case. The court added jurors had their notebooks, counsel could refresh jurors' recollection during summation, and jurors could request testimony be readback. Based on all of these factors, the court concluded the delay was reasonable and justified, and Breceda suffered no prejudice.

15

After counsel argued, the trial court denied without prejudice Breceda's motion for a mistrial.[22] The court reasoned that based on the evidence and assuming there were 12 jurors, the trial could proceed. The court stated it would ask jurors whether they followed the court's admonishments. The court opined Breceda's right to a fair trial was "preserved and . . . safeguarded." The court declared a recess until the following morning.

*I. May 27, 2020—Wednesday*

That morning, the parties stipulated to the trial court excusing the juror who was unwilling to return. In the jury's presence, the trial court welcomed and thanked them for returning. The court advised jurors of the COVID-19 safety measures.

The trial court asked the jurors a series of questions to ensure they obeyed the court's admonishments when the court paused the proceedings in March. The court reminded jurors they had to decide the case based on the evidence presented and the law the court would provide to the jury. The court asked whether jurors had discussed the case with anyone, whether they learned anything intentionally or unintentionally, whether they were upset about being there, and about scheduling. An alternate juror, Juror No. 192, responded affirmatively to the first question.

Juror No. 192 explained he spoke generally to his wife about the case being a murder trial, and this was why he was being asked to return. This juror did not believe he told her the facts of the case, but he was not sure. She did not provide him any information about the case. He told his employer he had to return for jury duty for a serious case, but he did not discuss the facts of the case. He confirmed these interactions would not affect his ability to remain an impartial juror. Breceda moved to excuse him. The trial court denied the motion because Juror No. 192 did not intentionally violate the

---

[22] During Counsel's argument, a juror called in and informed the trial court he had a medical procedure scheduled for June 1. The court asked whether the attorneys objected to scheduling around June 1 and June 2. Counsel said he had no objection.

16

court's orders. Before recessing for the morning, the court replaced the juror unwilling to return with Juror No. 192.

Trial resumed that afternoon with testimony from a police officer, Bradbury's cross-examination, and a prosecution investigator. Bradbury confirmed she could not verify whether Gomez-Lee stole a knife from the grocery store because Gomez-Lee did not reveal this detail until four years after the incident.[23]

The prosecution investigator testified he analyzed Breceda's and Gomez-Lee's cell phone activity. The court declared a recess before the investigator could finish testifying.

### J. May 28, 2020—Thursday

The following day, the investigator testified Breceda's and Gomez-Lee's cell phone data was consistent with them stopping at the grocery store. Additionally, the data was consistent with them calling each other while in the grocery store. The prosecution rested. The trial court denied Breceda's section 1118.1 motion as to count 1.

### K. June 8, 2020—Monday

Breceda testified he was a debt collector—he collected money on behalf of drug dealers for drug debts. Breceda admitted he suffered prior convictions for armed carjacking, methamphetamine sales, evading a police officer, and two convictions for vehicle theft. He had worked for Villaseñor on three prior occasions and was paid with money or drugs.

On the morning of the incident, Breceda was with Gomez-Lee at an internet café when Villaseñor called him to work. Villaseñor arrived at the café and asked Breceda to rent a motel room. After Gomez-Lee rented a motel room, Breceda, Villaseñor, Gomez-Lee, and another man went to the room and used methamphetamine.

---

[23] During Bradbury's testimony, there was a short recess where the trial court informed counsel a juror had a medical appointment the following day and another juror was unavailable the week of June 1. Counsel did not object to resuming on June 8.

17

Breceda acknowledged Villaseñor had a cooler, but he could not remember what was in it, and he did not take anything from it. Villaseñor told Breceda that they were going to a couple of cities, and they all left the motel room.

Villaseñor and Breceda left in Villaseñor's car to collect drug debts. Breceda usually carried a gun when he worked, but he was not armed because he did not expect Villaseñor's call. They made two stops before arriving at Nott's apartment on Peppertree Lane.

Nott allowed them inside, and they went to a back room where they met Murphy. Murphy gave Villaseñor some money, they used methamphetamine, and Murphy made a few telephone calls because he still owed Villaseñor money. Villaseñor told Breceda they were going to wait in the car until Murphy collected the unpaid debt. Before they left the apartment, Murphy agreed to let Villaseñor take a 10-inch long martial arts type knife as collateral. Villaseñor and Breceda returned to the car to wait. Breceda was uncomfortable waiting because he was unfamiliar with the area and was concerned for his safety.

Villaseñor fell asleep, and Breceda became increasingly agitated and paranoid. Breceda went for a walk and called Gomez-Lee, who picked him up. They drove around and used methamphetamine. Breceda denied they went to a grocery store and stole a knife and denied he was armed. Breceda felt revitalized and told Gomez-Lee to take him back.

Breceda got back into the car, saw Villaseñor sleeping, and unsuccessfully tried to rouse him. Breceda waited about 20 minutes and tried again.

Villaseñor awoke, angrily yelled at Breceda, and with his left hand reached down and grabbed the knife he took from Murphy. Breceda used both hands to grab his left hand and take the knife. Villaseñor moved over the center console toward Breceda who had his back to the passenger side door. Villaseñor was inches away from Breceda trying to take the knife. With the knife in his left hand, Breceda pushed both hands

18

towards Villaseñor's upper chest area to keep him away and prevent him from getting the knife. Breceda saw blood coming from Villaseñor's upper chest area.

Villaseñor saw the blood and got out of the car. Breceda also got out of the car, but he saw the keys in the ignition, got in the driver's side, and drove away. He touched the sun visor earlier that day, but he did not know how it ended up on the ground. He did not know what happened to the knife, but it may have burned in the car.

Breceda explained he did not call the police because he was on parole and probation, they would not believe him, he was committing a crime collecting drug debts, and he did not want to be considered a snitch. He drove around repeatedly calling Gomez-Lee who finally answered, and they met. Very early the next morning, he met Gomez-Lee again and told her that he needed to get rid of Villaseñor's car. They met, and she followed him to a field in San Juan Capistrano. Breceda doused Villaseñor's car in gasoline and lit it on fire to destroy evidence. Breceda repeatedly denied he and Gomez-Lee developed a plan to kill Villaseñor so he could take control of Villaseñor's drug dealing operation or to steal money from him.

*L. June 9, 2020—Tuesday*

The trial court instructed the jury. During her closing argument, the prosecutor vigorously argued for a first degree murder verdict. Counsel began his argument before the trial court recessed for the day.

*M. June 10, 2020—Wednesday*

Counsel concluded his closing argument during which he conceded Breceda committed count 2. After the prosecutor delivered her rebuttal, the trial court gave the case to the jury.

During the first day of deliberations, the jury asked the trial court for a readback of Gomez-Lee's and Girlfriend's testimony concerning the knife, and Nott's testimony. The court reporter readback the testimony. The jury recessed for the evening.

19

*N. June 11, 2020—Thursday*

The next morning, the jury resumed deliberations, and the court reporter completed the readback of testimony. The jury sent the trial court two questions on their inability to reach a unanimous verdict on first degree murder. The court instructed the jury further. Less than one hour later, the jury returned its verdicts. The jury acquitted Breceda of first degree murder. The jury convicted Breceda of count 1, second degree murder, and count 2, and found true the firearm allegation.

*III. Posttrial*

At a bifurcated bench trial, the trial court found true the prior serious and violent conviction but found not true the prior prison term. Breceda filed a motion for a new trial, which the trial court denied. The court sentenced Breceda to prison for 35 years to life as follows: count 2-two years doubled to four years; and count 1-15 years to life doubled to 30 years to life plus one year for the firearm enhancement.

DISCUSSION

Breceda argues the trial court violated his due process right to a fair trial by denying his motions for a mistrial. We disagree.

*I. Motions for Mistrial*

*A. Forfeiture*

Relying primarily on *People v. Mills* (2010) 48 Cal.4th 158 (*Mills*), the Attorney General argues Breceda forfeited appellate review of this issue because he did not renew his motion for a mistrial. Breceda replies that renewing his motion would have been futile because the trial court denied his previous two motions and overruled his objection to Juror No. 192 remaining on the jury.

It is true that, "[a]s a general matter, when a trial court denies a motion without prejudice the matter is forfeited if not renewed. [Citation.]" (*Mills, supra,* 48 Cal.4th at p. 170 [counsel abandoned motion when counsel did not file renewed briefing].) After the trial court denied Breceda's oral motion for mistrial on March 16

20

without prejudice, Breceda filed a written motion for a mistrial during the pause in proceedings. When proceedings resumed on May 26, the trial court denied that mistrial motion without prejudice. Breceda did not renew his motion for a mistrial. Although he did not file additional written argument, we do not conclude he forfeited appellate review of this issue.

"[A]ppellate courts have discretion to address constitutional issues raised on appeal [citation], particularly where the issue presented is 'a pure question of law' turning on undisputed facts [citation] or when '"important issues of public policy are at issue . . ."' [citation]." (*In re Spencer S.* (2009) 176 Cal.App.4th 1315, 1323.) Needless to say, this is a constitutional issue that concerns important public policy issues. Even assuming Breceda forfeited his claim, we exercise our discretion to reach the issue. (*People v. Williams* (1998) 17 Cal.4th 148, 161-162, fn. 6 [appellate court discretion to address forfeited issue].)

B. *Did the Trial Court Err?*

Breceda contends the unprecedented 73-day delay and the 11-day delay caused "a high probability of prejudice [and] reversal is warranted . . . ." He asserts the delays resulted in the following concerns: (1) because the jurors only heard the prosecution's evidence, jurors would decide the case, "even if unintentionally," in the prosecution's favor; and (2) jurors would discuss the case with others.[24] We address each of his mistrial motions separately.

---

[24] In his reply brief, Breceda clarifies his argument as follows: "[His] concern is not that the jurors would forget the evidence they had heard as much as it is that during the lengthy separation they would dwell on it, recall it over and over again, and intentionally or unintentionally, decide he was guilty before hearing the defense's case and his testimony."

Because the jurors could not both forget the evidence and deliberate on the evidence, we conclude Breceda has abandoned any argument jurors would forget the evidence. In any event, during deliberations, the jury requested and the clerk readback Gomez-Lee's, Girlfriend's, and Nott's testimony refreshing the jury's recollection of the

21

A criminal defendant has a fundamental constitutional right to a fair trial by an impartial jury. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 16; *Duncan v. State of Louisiana* (1968) 391 U.S. 145, 149.) "It is well settled that legal necessity for a mistrial 'arises from an inability of the jury to agree, or from physical causes beyond the control of the court, such as the death, illness, or absence of judge or juror, or of the defendant.' [Citation.]" (*People v. Coleman* (1992) 9 Cal.App.4th 493, 496 (*Coleman*); *People v. Manson* (1976) 61 Cal.App.3d 102, 202.) "'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions. [Citation.]' [Citation.] A motion for a mistrial should be granted when ""'a [defendant's] chances of receiving a fair trial have been irreparably damaged.'"" [Citation.]" (*People v. Collins* (2010) 49 Cal.4th 175, 198-199.)

*1. First Mistrial Motion*

Breceda first moved for a mistrial on Monday, March 16, 2020, the day the trial court paused the proceedings because three jurors were ill and Breceda refused to waive time and refused to proceed with 11 jurors. Stripped down, Breceda's arguments were prospective. He argued it was uncertain when proceedings would resume and whether jurors would be available, and a lengthy delay would cause jurors to forget the evidence, prejudge the case, and discuss the case with others. His motion for a mistrial at this stage of the proceedings was premature. Juror illness can amount to a legal necessity to grant a mistrial. (*Coleman, supra,* 9 Cal.App.4th at p. 496.) But at this time, the jurors were expected to return and the length of the jurors' absence was speculative beyond the ordered three-week recess. Not every juror illness necessitates a mistrial.

evidence, including on what the parties agree was the critical evidence at trial—who procured the knife, Villaseñor or Breceda?

22

Breceda was asking the trial court to assume jurors would forget the evidence and violate its orders, and to conclude he was prejudiced at the outset. Indeed, the trial court explained a mistrial was unnecessary at that time to protect Breceda's due process rights and if circumstances changed, he could renew his motion, which he did. The court's ruling denying his mistrial motion without prejudice was not beyond the bounds of reason. It was too early to tell what impact, if any, a pause in proceedings would have on Breceda's constitutional rights. There was no legal necessity to grant a mistrial at this juncture of the proceedings.

Although Breceda claims "[g]ood cause for a continuance is not the proper lens to view his claim in this case," it is necessary to examine if the trial court's denial of his mistrial motion and grant of a continuance struck the proper balance of protecting his constitutional rights and the jurors' health, and preserving judicial resources. (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1487 ["remedy of mistrial would necessitate a second expenditure of substantial prosecution, defense, and judicial resources"].)

A trial court may grant a continuance in a criminal case only for good cause. (§ 1050, subd. (e).) "'The cases recognize that, as a general matter, a trial court "has broad discretion to determine whether good cause exists to grant a continuance of the trial" [citation], and that, in reviewing a trial court's good-cause determination, an appellate court applies an "abuse of discretion" standard.' [Citation.] '[I]n making its good-cause determination, a trial court must consider all of the relevant circumstances of the particular case, "applying principles of common sense to the totality of circumstances . . . ."' [Citation.]" (*Stanley v. Superior Court* (2020) 50 Cal.App.5th 164, 169 (*Stanley*).) "'"The granting or denial of a motion for continuance in the midst of a trial traditionally rests within the sound discretion of the trial judge who must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the

23

motion.'" [Citation.] In the absence of a showing of an abuse of discretion and prejudice to the defendant, a denial of a motion for a continuance does not require reversal of a conviction. [Citation.]' [Citations.]" (*People v. Panah* (2005) 35 Cal.4th 395, 423.)

Health quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date. Three cases are illustrative.

In *In re Venable* (1927) 86 Cal.App. 585, 587 (*Venable*), the court denied habeas corpus relief to a prisoner whose trial was delayed because "an epidemic of infantile paralysis was prevalent in the town wherein the sessions of the . . . court were held and . . . for that reason no juries were called during that period." The court held the epidemic constituted good cause for continuing the trial and, where the trial was continued eight days, there was no "unreasonable delay in bringing the case to trial after the cessation of the epidemic." (*Id*. at pp. 587-588.)

In *People v. Tucker* (2011) 196 Cal.App.4th 1313, 1315, 1318 (*Tucker*), the court upheld a one-week delay to commence a trial when defendant was in custody at a correctional facility that was under quarantine because a prisoner had contracted the H1N1 flu virus. The court opined the following: "A contrary holding would require trial court personnel, jurors, and witnesses to be exposed to debilitating and perhaps life threatening illness. Public health concerns trump the right to a speedy trial." (*Id.* at p. 1314.)

Although decided after the trial court's pause here, the court in *Stanley, supra,* 50 Cal.App.5th 164, held similarly because of the COVID-19 pandemic. At issue in *Stanley* were the Chief Justice's March 23 and April 29, 2020, orders continuing all jury trials for a total of 90 days and extending by a total of 90 days the time period in section 1382 for holding a criminal trial. (*Id*. at pp. 167-168.) The court relied on *Venable* and *Tucker* and stated, "Health quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date." (*Id.* at p. 169.) In reaching its conclusion, the *Stanley* court relied on the Chief's Justice's April 29

order stating "'[c]ourts are clearly places of high risk during this pandemic because they'" are well populated and opined "the severity of the COVID-19 pandemic and the impact it has had within this state" constituted good cause for the 90-day continuances and extensions of time (*id.* at p. 166).

Venable, Tucker, and Stanley all support the trial court's conclusion the COVID-19 pandemic provided good cause to continue Breceda's trial.[25] Breceda does not assert good cause was lacking. Foremost on the trial court's mind was protecting Breceda's due process and speedy trial rights and the jurors' health. But the court was also cognizant of the fact the matter would be resolved quicker if it paused the proceedings and tried to proceed than if it declared a mistrial and started over. Twenty one of the prosecution's 23 witnesses had already testified. Only three witnesses remained. Five of the seven days of trial testimony were complete. The court's decision to pause the proceedings when almost three-fourths of the testimony had been heard in the face of a public health crisis was not irrational or arbitrary—to the contrary, it was the product of a careful and reasoned weighing of a defendant's constitutional rights, jurors' health, and judicial resources in real time during the outbreak of a pandemic. (*People v. Vasquez* (2021) 72 Cal.App.5th 374, 394 (dis. opn. of O'Leary, P. J.) [trial court in "proverbial catbird seat" viewing cases in real time].)

True, it was unknown when the trial would resume. Breceda faults the trial court for "blind[] optimis[m]" and "whimsical thinking" in believing the recess would last only three weeks. Breceda's appellate counsel is unnecessarily harsh. The trial court repeatedly said it was trying to protect Breceda's constitutional rights and the jurors' health while dealing with widespread confusion and uncertainty during a rapidly evolving

---

[25] Other cases where the COVID-19 pandemic caused delays are not instructive here. *Bullock v. Superior Court* (2020) 51 Cal.App.5th 134, 156, and *Lacayo v. Superior Court* (2020) 56 Cal.App.5th 396, 399-400, concerned delayed preliminary hearings. *In re M.P.* (2020) 52 Cal.App.5th 1013, 1021, concerned a juvenile dependency case continued past the statutory deadline.

global pandemic.  We commend the trial court for its apparent evenhandedness and steadiness during an unprecedented crisis and for making an exemplary record detailing its rulings and the COVID-19 safety measures the court implemented.  Yes, the recess lasted 73 days, the COVID-19 pandemic continues on, and courts, like us all, are still grappling with its effects and impact.  But only hindsight is 20/20.  We do not expect trial judges to be omnipotent.

It is also true that it was unknown how a lengthy recess would impact the jurors and what prejudice, if any, that recess would cause Breceda.  But all of those issues were better addressed after the recess, not before, and best at the end of the trial when the trial court could consider the motion after hearing all the evidence.  Thus, the trial court did not abuse its discretion by denying Breceda's first mistrial motion and concluding there was good cause for a continuance.  These rulings did not violate Breceda's due process right to a fair trial.

2. *Second Mistrial Motion*

Breceda filed a motion for a mistrial during the recess.  Before the court declared the recess on March 16, 2020, the court admonished jurors not to form any opinions about the evidence, discuss the case or the evidence, conduct any independent research, or read or listen to any news reports about the case.

The trial court considered Breceda's mistrial motion, and speedy trial motion, when proceedings resumed on May 26.  The court explained the delay was reasonable because of the COVID-19 pandemic, jurors' memories could be refreshed if necessary, and Breceda did not suffer any prejudice.  The court stated it appeared the jurors were willing to return and proceed with the trial subject to a few scheduling conflicts.  The court ruled it would deny the mistrial motion "[w]ith one caveat."  The court said it would ensure jurors obeyed its orders.

The following day, the trial court did just that.  The court reminded jurors they had to decide the case based on the evidence and the law.  The court asked jurors

26

whether they had discussed the case with anyone, whether they learned anything intentionally or unintentionally, and whether they had concerns or were upset about being there. Only one juror, Juror No. 192, responded affirmatively to one question, which we discuss anon.

Breceda asserts the unprecedented 73-day delay during the prosecution's case-in-chief resulted in jurors deciding the case in the prosecution's favor and jurors discussing the case with others. The parties cite to no case, and we found none, where there was a midtrial recess approaching 73 days in a criminal *jury* trial. The parties do cite to the following cases where there were recesses at various stages of the proceedings.

Breceda cites to the following cases to support his claim the delay violated his due process right to a fair trial: *People v. Santamaria* (1991) 229 Cal.App.3d 269, 277 (*Santamaria*) (11-day delay during deliberations); *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14, 20 (*Engleman*)[26] (three-week delay after prosecution rested but before defendant presented his case); and *U.S. v. Hay* (9th Cir. 1997) 122 F.3d 1233, 1235-1236 (*Hay*) (48-day delay after instruction but before summation).

The Attorney General cites to the following cases to support his assertion there was no violation: *People v. Gray* (2005) 37 Cal.4th 168, 226 (*Gray*) (338-day delay between guilt phase and penalty phase of capital trial), *People v. Stanley* (1995) 10 Cal.4th 764, 836 (*Stanley*) (more than three-month delay during penalty phase); *People v. Gopal* (1985) 171 Cal.App.3d 524, 544 (*Gopal*) (10-week delay during trial testimony in *bench* trial); and *United States v. Diggs* (9th Cir.1981) 649 F.2d 731, 737-738 (*Diggs*)[27] (11-day recess between close of evidence and closing argument due to illness of juror).)

---

[26]     Disapproved on another ground in *People v. Lively* (1992) 10 Cal.App.4th 1364, 1370-1373.

[27]     Overruled on other grounds in *United States v. McConney* (9th Cir. 1984) 728 F.2d 1195, 1201 (en banc).

Our research uncovered other cases where there were delays of varying lengths. (*People v. Erno* (1925) 195 Cal. 272, 282 (*Erno*) [10-day adjournment during trial not prejudicial denial of fair trial]; *People v. Katzman* (1968) 258 Cal.App.2d 777, 789 (*Katzman*)[28] [13-day continuance during trial error but not prejudicial]; *United States v. Pearson* (11th Cir. 2020) 832 Fed.Appx. 679, 684 [denial of mistrial motion after 22-day delay during presentation of evidence not abuse of discretion]; *U.S. v. Smith* (4th Cir. 1995) 44 F.3d 1259, 1267 [denial of mistrial motion after 32-day delay during prosecution's case-in-chief not abuse of discretion]; *Knuckles v. Com.* (Ky. 2010) 315 S.W.3d 319, 322 (*Knuckles*) [14-day delay during trial testimony not prejudicial and did not violate right to speedy trial or right to due process]; *State v. White* (Vt. 1971) 274 A.2d 690, 693-694 [62-day separation of jury between empanelment and trial in misdemeanor case prejudicial].)[29]

Needless to say, the delay in this case was long—73 days—longer than all but the delay in *Gray* and *Gopal*, neither of which are on all fours here. (*Gray, supra,* 37 Cal.4th at p. 226 [delay between guilt and penalty phases of capital trial]; *Gopal, supra,* 171 Cal.App.3d at p. 544 [delay in bench trial].) But Breceda cites to no case, and we found none that states a lengthy delay *alone* establishes a violation of due process. The Attorney General notes that when addressing whether there was a speedy trial violation, the Supreme Court of the United States approved a four-part balancing test. (*Barker v.*

---

[28]    Disapproved on another ground in *Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 780, footnote 11.

[29]    There are also cases where there was a break during jury deliberations. (See *People v. Bolden* (2002) 29 Cal.4th 515, 561-562 [13-day break for Christmas holidays].) But jury deliberations are a critical point in the proceedings where jurors are particularly susceptible to influence from outside sources. (*Santamaria, supra,* 229 Cal.App.3d at pp. 278-279.)

*Wingo* (1972) 407 U.S. 514, 530 [length of delay, reason for delay, defendant's assertion of right, and prejudice].)

Here, although the delay was long, it was unavoidable due to the pandemic. The COVID-19 pandemic was unprecedented. The trial court continued the case for three weeks, from March 16 to April 6, 2020. But the Governor's, the Chief Justice's, and the presiding judge's orders kept this case in recess until May 26, 2020. The trial court had no alternative—it could not restart proceedings and proceed with the trial.

As we explain above, Breceda contends there was a probability the 73-day delay near the end of the prosecution's case-in-chief caused the jurors to decide the case in the prosecution's favor and to discuss the case with others. Essentially, his claim is we must presume jurors violated the trial court's orders. Breceda's concerns are belied by the record.

There was no evidence jurors had already decided the case when they returned to court on May 26. It can just as easily be speculated that because the prosecution's case was more remote in time, the strength of the prosecution's evidence faded in the jurors' minds. The record demonstrates all but one of the jurors, many of whom were over 60 years old, willingly returned to court to continue with the proceedings. The record includes no evidence any of the jurors expressed any concern about the COVID-19 safety measures the court implemented prior to their return or that they feared infection because they were in a courtroom. The court reminded jurors they had to decide the case based on the evidence and the law and asked whether they had any concerns or were upset about continuing with the trial. No one responded in the affirmative. "We do not agree that, in the absence of any proof and in the face of the trial court's admonitions to the jury, it is 'reasonable to infer' the jury's impartiality was compromised." (*Gray, supra,* 37 Cal.4th at p. 229.)

The only evidence Breceda cites to in support of his claim there was error was Juror No. 192's admission he spoke to his wife and employer about returning to jury

service during the COVID-19 pandemic.  The record reveals the juror explained to them he had to return to jury service during the pandemic because it was a murder case.  He could not remember what he shared with his wife beyond that, if anything.  The trial court inquired of this juror and reasonably concluded he did not intentionally violate the court's orders.  Although Breceda moved to have Juror No. 192 dismissed, he did not claim his actions were misconduct or formed the basis of a mistrial motion.  We note Breceda does not complain on appeal of any juror misconduct.  Based on this record, Breceda's concerns the delay caused jurors to disobey the court's orders were sheer speculation.

In arguing the delay requires reversal, Breceda relies on *Santamaria, supra,* 229 Cal.App.3d 269, *Engleman, supra,* 116 Cal.App.3d Supp. 14, and *Hay, supra,* 122 F.3d 1233, to support his assertion the trial court erred by denying his mistrial motion.  All three cases are inapposite.

In *Santamaria*, the jury had been deliberating for two days when the trial court adjourned for 11 days due to the judge's absence.  (*Santamaria, supra,* 229 Cal.App.3d at pp. 281-283.)  The trial had involved 12 days of testimony, 32 witnesses and 60 exhibits.  (*Id.* at pp. 281-282)  The court stated the following:  "A long adjournment of deliberations risks prejudice to the defendant both from the possibility that jurors might discuss the case with outsiders at this critical point in the proceedings, and from the possibility that their recollections of the evidence, the arguments, and the court's instructions may become dulled or confused.  [Citations.]  Obviously, the longer the separation, the greater the risk.  A long adjournment of deliberations also disrupts the very process and pattern of the jury's orderly examination of the evidence."  (*Id.* at pp. 277-278.)  In addition to the risk of prejudice, the court noted the trial court could have substituted in another judge.  (*Id.* at p. 278.)  Based on the risk of prejudice, the lack of a showing of good cause for the delay and the availability of an alternative to suspending deliberations, the court concluded the trial court "exceeded the bounds of

30

reason and abused its discretion with this inordinate interruption in deliberations" and the error compelled reversal. (*Id*. at pp. 278-279, fn. omitted.) Breceda's reliance on *Santamaria* is misplaced because in that case there was no good cause for the delay, but here there was. Also, the delay in that case occurred during a critical point in the trial, jury deliberations, but here it did not. Finally, due to the court's closure, the case could not be transferred to another judge.

In *Engleman*, the trial judge was on temporary assignment in a different jurisdiction. (*Engleman, supra,* 116 Cal.App.3d Supp. at p. 20.) Instead of transferring the case to another judge in the jurisdiction, the judge adjourned the trial for three weeks immediately after the prosecution rested its case so that he could return to his home court. (*Ibid*.) The appellate department of the superior court concluded the error was inherently prejudicial and compelled reversal because the jury was left with a one-sided presentation for three weeks. (*Id*. at p. 21.) The court explained the following: "This would cause the jurors to determine the case before hearing both sides. Given the length of the delay, we think it must have been practically impossible for the jurors to keep an open mind as to possible answers to the [prosecution's] case." (*Ibid*.) Breceda's reliance on *Engleman* is also misplaced because here, again, there was good cause for the pause in proceedings and there were no simple solutions such as transferring the case to another judge.

In *Hay*, the trial began in February but unexpectedly extended into summer and some jurors informed the trial court the trial might overlap with their vacations. (*Hay, supra,* 122 F.3d at pp. 1234-1235.) Prior to the continuance, defendant offered to proceed with only 11 jurors to avoid a lengthy recess and an alternate juror was available. (*Id*. at p. 1235.) The trial court granted a 48-day continuance to accommodate juror vacations after the parties rested and the trial court instructed the jury, but before closing argument and jury deliberations. (*Id*. at p. 1235.) The *Hay* court held the 48-day continuance was reversible error, despite the absence of a showing of actual prejudice because the case was nearly over, an alternate juror was available, and the parties

31

stipulated to 11 jurors. (*Id*. at pp. 1235-1236.) Acknowledging the court in *Diggs, supra,* 649 F.2d at page 738, held a defendant must establish actual prejudice for the separation to constitute reversible error, the *Hay* court opined the 48-day separation "'involve[d] such a probability that prejudice will result'" that defendant's due process rights were violated. (*Hay, supra,* 122 F.3d at p. 1236.) The court relied on the facts the case involved "complex, technical evidence against two defendants over a period of nearly four months" and the length of the recess risked that jurors would be exposed to improper outside influences. (*Ibid*.) *Hay* is inapt because here there was good cause for the delay and there was no complex or scientific evidence such that a delay would have been detrimental to jurors' ability to recall specific, complicated evidence. Also, Counsel did not provide the court with the options that were available to the trial court in *Hay*.

Breceda also contends an 11-day delay resulted in similar concerns about deciding and discussing the case. But Counsel did not object to any of the scheduling issues that arose when proceedings resumed. He cannot now complain that delay prejudiced him. (*People v. Harris* (2013) 57 Cal.4th 804, 849 ["Because defendant did not raise this basis for his [mistrial] motion at trial, he has forfeited the claim on appeal"].) Therefore, the trial court's denial of Breceda's second mistrial motion was not arbitrary or capricious and it did not violate his due process rights.

*3. Was Breceda Prejudiced?*

Assuming for the sake of argument the trial court erred by denying Breceda's mistrial motions, the next step would be to determine whether he was prejudiced. Breceda asserts a 73-day midtrial delay during the COVID-19 pandemic "defies harmless error analysis" and was a structural error requiring reversal.

"[*Chapman v. California* (1967) 386 U.S. 18 (*Chapman*)], established that federal constitutional errors are properly subject to review for harmlessness. In the nearly 50 years since *Chapman* was decided, the high court repeatedly has emphasized that most errors implicating a federal constitutional right . . . are amenable to harmless error

32

analysis and that only a 'very limited class of cases' are subject to per se reversal. [Citations.]  In *Arizona v. Fulminante* (1991) 499 U.S. 279 . . . , the high court categorized constitutional errors into two groups.  Most errors, the court explained, are '"trial error[s],"' occurring 'during the presentation of the case to the jury.'  [Citation.] They are amenable to harmless error review because they can be 'quantitatively assessed in the context of other evidence presented in order to determine whether [their] admission was harmless beyond a reasonable doubt.'  [Citation.]  'Structural defects,' on the other hand, 'defy analysis by "harmless-error" standards' [citation] because they are not 'simply an error in the trial process,' but rather an error 'affecting the framework within which the trial proceeds' [citations]. [¶]  The high court has identified as structural error constitutional violations such as the denial of counsel or of self-representation, racial discrimination in jury selection, and trial before a biased judge.  [Citations.]  The court also has provided further guidance on categorizing errors as structural.  For example, it explained . . . structural errors 'deprive defendants of "basic protections"' [citation] and 'necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence.'  [Citations.]  In other pronouncements on the subject of structural error, however, the court has focused, not on the effect of the constitutional violation at trial, but on 'the difficulty of assessing the effect of the error' or the 'irrelevance of harmlessness.'  [Citation.]"  (*People v. Aranda* (2012) 55 Cal.4th 342, 363-364.)

A midtrial continuance, if it were determined to be error, is not the type of error affecting the framework within which the trial proceeds.  Nor is it a situation that defies harmless error analysis.  It is possible to determine whether jurors' memories have faded during the recess, either by inquiring directly of them or inferentially through the types of questions they ask.  It is possible to determine whether jurors improperly discussed the case with others or were subjected to an improper outside influence.  A midtrial continuance does not deny a criminal defendant basic protections that render the

33

trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence. Thus, any error would be reviewed pursuant to the standard articulated in *Chapman, supra,* 386 U.S. 18—was the error harmless beyond a reasonable doubt? Our conclusion is supported by California, federal, and other state cases that had addressed midtrial continuances.

About 100 years ago, our Supreme Court in *Erno, supra,* 195 Cal. at pages 282-283, concluded defendant failed his burden to establish he was prejudiced by the 10-day adjournment before submission of the case to the jury. In *Katzman, supra,* 258 Cal.App.2d at pages 789-790, the court concluded defendant failed to demonstrate he was prejudiced by the 13-day delay during the trial. In *Gray, supra,* 37 Cal.4th at page 229, addressing whether a 338-day delay between the guilt and penalty phases violated defendant's due process right to a fair trial, our Supreme Court stated, "We do not agree that, in the absence of any proof and in the face of the trial court's admonitions to the jury, it is 'reasonable to infer' the jury's impartiality was compromised."

Federal and other state authority also support our conclusion. In *Diggs*, the court stated, "[t]he circuits are virtually unanimous that in order for a jury separation to constitute reversible error, the defendant must show that he suffered actual prejudice because of the separation." (*Diggs, supra,* 649 F.2d at p. 738 [collecting cases].) In *Knuckles, supra,* 315 S.W.3d at page 322, the Kentucky Supreme Court cited to *Diggs* and stated, "Ordinarily, to constitute reversible error, a defendant must show actual prejudice resulting from a continuance or other separation of the jury." (Fn. omitted.)

Here, the record does not establish Breceda suffered actual prejudice. Before the pause in proceedings, the trial court admonished the jury to not form any opinions about the evidence, discuss the case or the evidence, conduct any independent research, or read or listen to any news reports about the case. When jurors returned, the court inquired of them whether they had obeyed the court's orders and the record demonstrates they had, except the one instance where a juror told his wife and employer

34

he had to return to jury service because he was on a murder case. It is pure speculation to conclude that during the recess jurors decided the case in the prosecution's favor or were influenced by outside sources. We presume jurors follow the trial court's instructions. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211; *Gray, supra,* 37 Cal.4th at p. 231 ["[w]e presume that jurors understand and follow the court's instructions"].)

Additionally, the record demonstrates jurors willingly returned to complete their jury service. The record also establishes jurors kept an open mind and fairly weighed the evidence. During deliberations, the jury asked for a readback of testimony from Gomez-Lee, Girlfriend, and Nott. Had there been a rush to judgment the jury would not have bothered to have their recollections refreshed. Finally, the prosecution argued vigorously for a first degree murder verdict. In acquitting Breceda of that charge and convicting him of second degree murder, the verdict demonstrates the jury carefully considered the evidence and did not hastily accept the prosecution's case in its entirety.

Although the *Knuckles* court stated actual prejudice was required, it cited to *Hay*, and stated, "[e]ven absent a showing of actual prejudice, a delay may still 'involve[] such a probability that prejudice will result that it must be deemed inherently lacking in due process.'" (*Knuckles, supra,* 315 S.W.3d at pp. 322-323, fn. omitted.) The *Knuckles* court stated the following: "Where there is no showing of actual prejudice, courts have considered a number of factors to determine whether a due process violation has occurred, including the length of the delay, whether there was a good reason for the delay, whether the trial court properly admonished the jurors against communicating about the case with others prior to the separation, whether the case was so complex that a prolonged interruption would have a significant effect on the jurors' ability to remember complicated facts, whether alternatives to delaying the trial existed, and the extent of

35

publicity surrounding the case. In addition, prejudice is much more likely to be presumed where the delay occurs after jury deliberations have begun."[30] (*Knuckles, supra,* 315 S.W.3d at p. 323, fn. omitted.)

Here, a consideration of these factors causes us to conclude Breceda's due process right to a fair trial was not violated. The delay was long, but that was the only factor weighing in favor of a violation. The COVID-19 pandemic was good cause to continue the trial. The trial court properly admonished the jurors before the pause, and when they returned, ensured they obeyed the court's orders. Unlike in *Hay*, the case was not complex—Breceda admitted he inflicted the mortal wound and the only issue was whether he did so intentionally or in self-defense. Because of the Governor's, the Chief-Justice's, and the presiding judge's orders keeping the courts closed from March 17 to May 22, 2020, there was no alternative to delaying the trial. The record is silent on whether there was any trial publicity, but it is extremely likely the hourly updates on the COVID-19 pandemic overshadowed any courthouse reporting on the local news. Finally, the fact the delay occurred before jury deliberations began weighs against presuming there was prejudice. Based on these factors, we part company with the courts in *Engleman, supra,* 116 Cal.App.3d Supp. 14, and *Hay, supra,* 122 F.3d 1233, and cannot find the delay was inherently prejudicial. Therefore, Breceda's due process right to a fair trial was not violated as a matter of law.

## II. *Abstracts of Judgment*

Breceda contends we must order two errors in the abstracts of judgment corrected. The Attorney General agrees.

---

[30] The *Knuckles* court adopted the factors articulated in *State v. Kanae* (Hawaii Ct.App. 1998) 970 P.2d 506, 510, a case where there was a 17-day hiatus during jury deliberations, and *Santamaria, supra,* 229 Cal.App.3d 269, another case involving a delay during jury deliberations.

36

"An abstract of judgment is not the judgment of conviction; it does not control if different from the trial court's oral judgment and may not add to or modify the judgment it purports to digest or summarize." (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) A court may correct a clerical error in an abstract of judgment at any time. (*Ibid.*)

The indeterminate abstract of judgment indicates Breceda was convicted of count 1 by plea. The indeterminate abstract of judgment must be corrected to indicate the jury convicted him of count 1. The determinate abstract of judgment indicates he earned 1,873 of actual credit, but he had "0" total credits. The determinate abstract of judgment must be corrected to indicate he had "1,873" total credits.

## DISPOSITION

The judgment is affirmed. The clerk of the superior court is ordered to prepare corrected abstracts of judgment reflecting the above modifications and to forward certified copies to the Department of Corrections and Rehabilitation, Division of Adult Operations.

O'LEARY, P. J.

WE CONCUR:

GOETHALS, J.

ZELON, J.*

*Retired Justice of the Court of Appeal, Second Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.