UNITED STATES of America,
Plaintiff–Appellee,

v.

Henry HAY, Defendant–Appellant.

No. 95–50609.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 6, 1997.

Decided Aug. 19, 1997.

Jean M. Mohrbacher, Assistant United States Attorney, Los Angeles, CA, for plaintiff-appellee.

Eric Kraeutler and Thomas P. Hogan, Jr., Morgan, Lewis & Bockius, Philadelphia, PA, for defendant-appellant.

Before: SKOPIL, PREGERSON, and REINHARDT, Circuit Judges.

PREGERSON, Circuit Judge:

Defendant Henry Hay appeals his conviction of six counts of mail fraud. He claims

that the district court abused its discretion by ordering a forty-eight-day recess to accommodate juror vacations, admitting hearsay statements of Hay's codefendant against Hay, and limiting the length of Hay's direct examination. We have jurisdiction under 28 U.S.C. § 1291. We reverse.

## FACTS AND PRIOR PROCEEDINGS

In the early 1980's, Hay entered the business of designing, selling, and administering group health benefit plans providing health coverage for employees of small businesses. In 1982, Hay established the two health plan trusts at issue in this case: the Business Employers Trust ("BET") and the Professional Employers Trust ("PET"). These trusts were designed to hold the premiums paid in by employers purchasing health plans from Hay, and to disburse funds to pay medical claims for covered employees. BET operated from 1983 until its bankruptcy in September 1989. PET operated from August 1988 until December 1990.

Between 1983 and April 1987, BET covered employee claims using the employer premiums it received. BET's sole insurance coverage was a "stop-loss" policy with Lexington Insurance Company. Under this policy, Lexington agreed to reimburse BET only to the extent that BET paid claims in excess of the "stop-loss limit," which was $50,000 in some years and $60,000 in other years. During this period of operation under Lexington coverage, Hay's sales brochures correctly described BET as having "stop-loss protection provided by a major insurance carrier."

Effective April 1987, Hay transferred his stop-loss coverage from Lexington Insurance to a different company, Landmark Insurance. Hay then began to distribute brochures representing that BET was "underwritten" by Landmark. The government contends that these brochures were misleading because BET was not fully insured by Landmark. BET remained responsible for the first $50,000 of every claim.

Landmark refused to renew BET's stop-loss coverage after the coverage expired in April 1988. The government asserts that, at this point, the health plans were left without any insurance coverage and that Hay nevertheless continued to represent the plans as fully insured.

In May 1988, Hay began negotiating with Joseph Bartholomew, the president of California Benefit Life Insurance Company ("CBL"). The government contends that these negotiations culminated in an agreement under which Hay would pay CBL a "fronting fee," and CBL would falsely purport to insure certain employers whose premiums were being held in the newly-activated PET. According to the government, Hay then began to represent both BET and PET as being fully insured by CBL.

In late 1988, the California Department of Insurance ("DOI") began investigating Hay. DOI requested that Hay prove that the health plans were fully insured, or cease business operations. On February 23, 1989, Bartholomew signed a letter informing DOI that the plans were fully insured by CBL. In reliance on this letter, DOI allowed Hay to stay in business. Later, however, DOI received numerous complaints from dissatisfied employers, insurance agents, and employee participants in Hay's health plans, and DOI renewed its investigations.

In June 1989, DOI obtained a court order closing CBL for insufficient assets to continue operating as an insurer. In September 1989, Hay filed a bankruptcy petition for BET. In December 1990, Hay filed a bankruptcy petition for the company that had administered BET and PET, and ceased operating PET.

Hay was indicted in November 1993 for seven counts of mail fraud in violation of 18 U.S.C. § 1341. Bartholomew was charged in Counts III through VII of the indictment for aiding and abetting Hay. Both Hay and Bartholomew pleaded not guilty to all counts.

Hay and Bartholomew's joint trial began on February 28, 1995. The district court scheduled the trial for twenty-one days, with breaks between trial days for other court business. The court and the parties expected the trial to end on April 28, but the trial progressed more slowly than expected. On May 30, the district court granted Bartholomew's motion for a judgment of acquittal on Counts IV through VII against him, leaving only Count III. On May 31, the district court commented that Hay's direct examination was going "very slowly" and that there

appeared to be a "lack of organization" on the part of Hay's counsel. Consequently, the district court instructed Hay's counsel that he would have to complete Hay's direct examination in two and a half hours when the court reconvened on June 6.

Due to the unforeseen extension of the trial into the summer months, the court began receiving notes from jurors indicating upcoming scheduling conflicts. One juror had a vacation planned for June 21 through July 7. Another juror had a vacation planned for July 11 through July 25. In order to accommodate the jurors' schedules, the court announced on June 14 that the trial would probably need to be continued after the close of evidence "to a date of somewhere in the ... second week of August." Hay moved for a mistrial, claiming that a recess until August would cause the jury to forget the evidence and deny him a fair trial. The court denied Hay's motion.

The court recessed for forty-eight days, from June 20 to August 7. On August 7, the jury returned for closing arguments and deliberations. After deliberating for five days, the jury deadlocked on Count III against Bartholomew, the only count remaining against him. The jury also deadlocked on Count IV against Hay. Hay was found guilty on Counts I through III and V through VII. The district court sentenced Hay to sixty months in prison, followed by three years of supervised release.

## STANDARD OF REVIEW

Each of the issues raised on appeal is reviewed for abuse of discretion. *See United States v. Smith*, 538 F.2d 1359, 1361 (9th Cir.1976) (reviewing decision to recess during trial); *United States v. Cowley*, 720 F.2d 1037, 1040 (9th Cir.1983) (reviewing admission of hearsay); *United States v. Scott*, 789 F.2d 795, 799 (9th Cir.1986) (reviewing time limit on defendant's testimony).

## DISCUSSION

### I.  Forty-eight-day Recess

Hay contends that the district court abused its discretion by ordering a forty-eight-day recess to accommodate juror vacations between the close of evidence and the start of closing arguments. We agree. The district court should have proceeded with trial rather than call a recess on June 20.

The trial began in February 1995 with a full panel of twelve jurors, plus two alternates. In April 1995, one of the jurors was excused due to an injury and one of the alternates was seated. On May 30, juror Hale indicated that she would be unavailable from June 21 to July 7 due to a prepaid vacation. On June 15, alternate Rhyne indicated that she would be unavailable from July 11 to July 25, also due to a vacation. That same day, the district court expressed concern that the dwindling number of jurors might eventually lead to a panel of less than twelve.

Bartholomew and the government immediately agreed that they would be willing to proceed with only eleven jurors if that became necessary. Bartholomew furthermore offered to waive his closing argument in order to save time and avoid a lengthy recess. Hay's counsel at first stated: "We're not prepared to stipulate to [proceeding with eleven jurors] at this time." On June 20, however, Hay's counsel told the court that he had discussed the matter with Hay, and that Hay "would be willing to be judged by a jury of less than twelve, down to ... eleven." The court nevertheless decided that "we will simply let the matter ride and see where we are on August the 7th." The court then recessed from the close of evidence on June 20, until the start of closing arguments on August 7.

The district court should have proceeded with the trial. First, the trial was nearly over by the time the recess was called on June 20. All the evidence was in and the jury had been instructed. Only closing arguments and jury deliberations remained. Second, a full jury of twelve remained available after June 20 despite juror Hale's unavailability. In particular, alternate Rhyne could have been seated and was available for another 20 days-until July 10. Third, all of the parties had stipulated to proceeding with a jury of eleven if necessary. Accordingly, the trial could have proceeded even beyond the departures of both Hale and Rhyne.

Most importantly, we have never approved a jury separation even close to forty-eight

days in a criminal case. The eleven-day and eighteen-day separations upheld in *United States v. Diggs*, 649 F.2d 731 (9th Cir.1981), *overruled on other grounds, United States v. McConney*, 728 F.2d 1195 (9th Cir.1984) (en banc), and *Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir.1994), are not comparable. Nor are we aware of any comparable cases from other circuits. *Cf. United States v. Almonte*, 594 F.2d 261, 266–68 (1st Cir.1979) (one-night separation due to illness of jury foreman's spouse); *Blackmon v. United States*, 474 F.2d 1125, 1126 (6th Cir.1973) (weekend-long separation); *Cardarella v. United States*, 375 F.2d 222, 227–29 (8th Cir.1967) (one-night separation). A forty-eight-day jury separation during a criminal trial is unprecedented.

■ The government argues that even if the district court erred in ordering the separation, such error does not warrant reversal because Hay has failed to show actual prejudice. Ordinarily, a defendant must show actual prejudice in order for the separation to constitute reversible error. *Diggs*, 649 F.2d at 738.

In Hay's case, however, the unprecedented length of the separation "involves such a probability that prejudice will result" that it must be deemed "inherently lacking in due process." *Estes v. Texas*, 381 U.S. 532, 542–43, 85 S.Ct. 1628, 1632–33, 14 L.Ed.2d 543 (1965). During the trial, the jury heard complex, technical evidence against two defendants over a period of nearly four months. The jury could not be expected to adjourn this late in the case for a month and a half without forgetting any of the relevant evidence. Moreover, the length of the recess created a danger that jurors would be exposed to improper outside influences. Thus, the district court's abuse of discretion in ordering the forty-eight-day recess warrants a reversal regardless of Hay's showing of actual prejudice. *See Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991) (reversing without showing of actual prejudice where a "structural defect" renders a criminal trial unable to "reliably serve its function as a vehicle for determination of guilt or innocence") (internal quotation marks omitted).

## II. Admission of Hearsay

■ Because it is possible that there will be a retrial, we will consider briefly Hay's other arguments that may arise on retrial.

At trial, the prosecution called as a government witness Dixie Terry, a DOI employee who had interviewed Bartholomew on several occasions. Terry testified as to two statements that Bartholomew allegedly made to her. Hay contends that the district court abused its discretion when it admitted these two statements against Hay over Hay's hearsay objections.

Hearsay evidence is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). To be admissible, hearsay must fall within an established hearsay exemption or exception. Fed.R.Evid. 802.

■ The first hearsay statement challenged by Hay relates to a letter dated February 23, 1989, from Bartholomew to DOI, which formed the basis for Count III of the mail fraud charges. In this letter, Bartholomew asserted that "California Benefit Life is currently the carrier of record for all participants of both PET and BET for group health and dental benefits."

When the prosecution asked Terry what Bartholomew had told her about that letter, Terry responded that "[Bartholomew] said that he wrote the letter because Henry Hay was a friend of his and had asked him to do so, and when I asked if there was any coverage—." At this point, Hay objected and asked the court for an admonition. The court overruled Hay's objection to the first part of Terry's response ("he said that he wrote the letter because Henry Hay ... had asked him to do so"). The court did not admonish the jury to limit the scope of the admitted testimony to Bartholomew.

Terry's first hearsay statement was admissible against Bartholomew because Bartholomew's own statement was being offered against him. The hearsay statement is therefore admissible against Bartholomew under the party admission exemption. Fed.R.Evid. 801(d)(2)(A). The party admission

exemption does not apply to Hay, however. Because this statement was improperly admitted against Hay, reversal is warranted if the improper admission was not harmless. *United States v. George,* 56 F.3d 1078, 1083 (9th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 351, 133 L.Ed.2d 247 (1995).

We agree with Hay's contention that the admission of this statement was not harmless. The evidence against Hay on Count III-the fraudulent mailing of the February 23 letter from Bartholomew to DOI-was substantially weaker without the statement. The statement was the prosecution's only direct evidence that Hay caused Bartholomew to write the February 23 letter. Moreover, the record shows that the prosecution relied heavily on the statement in arguing Count III to the jury at closing argument. Accordingly, the district court's failure to exclude the first hearsay statement was an abuse of discretion warranting reversal on Count III.

■ The second hearsay statement challenged by Hay is Terry's testimony that Bartholomew told her that neither PET nor BET was insured by CBL. Terry testified to this statement twice at trial. Hay objected to its admission on both occasions. The court overruled Hay's objection the first time, but sustained his objection the second time. Hay contends that the court's overruling of his first objection was improper.

This statement was admissible against Bartholomew as a party admission, but was not admissible against Hay. The admission of this statement was harmless error, however, because Hay himself made a statement to the same effect. According to the testimony of another witness, Hay stated that BET and PET had "nothing to do with California Benefit Life." Given the similarity between Hay's own statement and the second hearsay statement, the improper admission of the second hearsay statement against Hay was harmless error.

### III. Time Limit on Testimony

■ Hay contends that the district court abused its discretion by restricting the duration of Hay's testimony in his own defense. Whether or not the district court erred in putting a time limit on Hay's direct testimony, any error was harmless. Hay does not identify any evidence that he was prevented from presenting or how the time limit weakened his case. Rather, Hay concedes that he was able to testify on redirect about the testimony that he had wanted to give on direct. Accordingly, the time limit does not afford a ground for reversal because Hay cannot show that the time limit prevented him from giving a thorough presentation of his case. *See Scott,* 789 F.2d at 799 (upholding time limit on defendant's testimony where "the jury received a full picture" of defendant's case and "[a]ny further testimony would have been cumulative").

### CONCLUSION

The district court abused its discretion when it ordered a forty-eight-day recess to accommodate juror vacations. The court also abused its discretion when it admitted damaging hearsay evidence concerning Count III against Hay. Accordingly, we reverse Hay's convictions on Counts I through III and V through VII.

REVERSED.