Filed 4/1/22  P. v. Harrison CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E076000 |
| v. | (Super.Ct.No. 16CR038307) |
| MARQUISE ELLIOTT HARRISON, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ingrid A. Uhler, Judge.  Affirmed.

Ellen M. Matsumoto, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Murphy and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Marquise Elliott Harrison was tried for murder during the early stages of the coronavirus disease 2019 (COVID-19) pandemic. After the first full day of evidence, during which the People had presented testimony from five of its witness, the presiding judge of the Superior Court of San Bernardino County and the Chief Justice of California issued a series of emergency orders that closed the courthouse for jury trials. When the trial was resumed over 60 days later, the trial judge found there had been good cause for the continuances and denied defendant's motion for a mistrial. After the jury convicted defendant of second degree murder and found true certain firearm enhancement allegations, the trial court denied defendant's motion for a new trial based on the same grounds as his mistrial motion and sentenced him to an indeterminate state prison term of 40 years to life.

On appeal, defendant concedes there was good cause for the midtrial continuance of his trial. But, he argues the timing and length of the delay violated his due process right to a fair trial, and the trial judge erred by denying his mistrial motion. In addition, although he concedes the trial court did all it could reasonably do to protect people in the courtroom from infection with COVID-19, he argues the judge abused her discretion by declining to individually question the jurors whether they had any concerns for their safety before resuming the trial. We find no error and affirm the judgment.

# I.

## PROCEDURAL BACKGROUND

By information, the People charged defendant with one count of murder (Pen. Code,[1] § 187, subd. (a)) and alleged various firearm sentence enhancements (§§ 12022.53, subds. (b) [personal use of a firearm], (c) [personal discharge of a firearm], (d) [personal discharge of a firearm causing great bodily injury and death]).  A jury found defendant guilty of second degree murder and found true the allegations that he personally discharged a firearm and caused the death of the victim.

The trial judge sentenced defendant to state prison for 15 years to life for the murder, plus a consecutive state prison term of 25 years to life for personally discharging a firearm and causing death (§ 12022.53, subd. (d)), for a total indeterminate term of 40 years to life.  The judge imposed an additional term of 20 years for discharging a firearm but struck it (§ 12022.53, subds. (c), (f)) and, pursuant to section 1385, dismissed the allegation that defendant personally used a firearm (§ 12022.53, subd. (b)).

# II.

## FACTS[2]

M.K. was friends with the victim and had known him for five or six years.  Around 9:30 p.m., on July 31, 2016, M.K. was at home in Rialto speaking to the victim on the

---

[1] Unless otherwise indicated, all undesignated statutory references are to the Penal Code.

[2] Defendant does not challenge the sufficiency of the evidence to support his conviction.  We must present the facts in the light most favorable to the judgment. (*People v. Curl* (2009) 46 Cal.4th 339, 342, fn. 3.)

3

telephone. The victim was in the parking lot of a liquor store nearby. About 10 to 15 minutes into the conversation, M.K. heard the victim say, "Hey" or "Hey, what's up" to another person. A minute or two later, the victim said, "What? Who is you?" It sounded to M.K. as if the victim "didn't know the person and was somewhat surprised." M.K. heard the muffled sound of another person's voice in the background but could not make out what was being said. The victim was quiet for a brief time, then said, "He shot me." M.K. then heard the victim making "gurgling noises." M.K. had not heard the victim make any threats, challenge anyone to a fight, or hear the victim being involved in a confrontation. When the victim did not respond to her, M.K. tried to call him back but got no answer. She then got into her vehicle and drove to the liquor store.

F.L. was driving and about to turn into the parking lot of the liquor store when he saw the victim in the parking lot talking on a phone. He did not see the victim with a weapon. It appeared to F.L. that the victim was trying to walk into the store and away from another man. This other man said, "What's up cuz?," and shot the victim. The shooter then fled through an alley.

An officer with the Rialto Police Department responded to the liquor store and found the victim lying face down on the ground with a gunshot wound to the upper right chest. He saw a knife in the victim's waistband and threw it away "for safety purposes." The officer checked for the victim's pulse and, finding he was still alive, applied chest compressions until paramedics arrived. The victim was transported to the hospital but died of his injuries. A spent cartridge case was discovered in a planter.

4

Defendant lived in an apartment that was roughly two-tenths of a mile from the liquor store. He arrived home around 10 p.m., shortly after the shooting. Soon thereafter, defendant was handling a firearm when he accidentally shot himself in the left leg. Police responded and recovered the firearm—a 40-caliber handgun—from a dumpster near the apartment. They also recovered the bullet that passed through defendant's leg and into a deep freezer and a spent cartridge case from a bathroom trashcan.

The bullet taken from the victim's body during a postmortem examination and the bullet recovered from the freezer were both fired from the gun found in the dumpster near defendant's apartment. The cartridge cases recovered from the liquor store planter and defendant's apartment had been fired using that same handgun recovered from the dumpster.

Surveillance video (without audio) that depicted the shooting in the liquor store parking lot was played for the jury. The video depicted a man dressed in white (whom the People alleged was the defendant) walking on a sidewalk past the victim as the victim was walking through the parking lot to the liquor store. The man dressed in white took a few more steps, then turned and walked toward the victim. When the man in white was close to the victim, the victim turned. The man in white then made a motion with his right arm that looked like he was pointing a gun at the victim, and the victim fell to the ground. The man in white then ran off.

Defendant testified he attended a party earlier that evening, where he consumed alcohol, and that he had shot the victim in self-defense. After a short confrontation, during which the victim told defendant, "Don't get smoked," the victim reached for his

5

waistband. Fearing the victim was reaching for a weapon, defendant pulled out his gun and shot him. A psychologist opined defendant suffered from posttraumatic stress disorder and major depressive disorder due to his past exposure to violence and individuals who suffer from those disorders may react impulsively to stressful situations and may respond more aggressively than is warranted.

In rebuttal, the People introduced defendant's statements to the police during an interview. At first, he first denied having any confrontation with the victim. But later, defendant admitted that he had intended to frighten the victim by shooting over his head and not to shoot him. Defendant did not tell the police that he was afraid of the victim or that the victim had reached for his waistband.

III.

DISCUSSION

A. *The Trial Court Did Not Abuse Its Discretion by Denying Defendant's Mistrial Motion.*

Defendant argues the midtrial continuance, in this case, was unprecedented in length and occurred at such an inopportune stage of the trial that his due process right to a fair trial was clearly violated, and the trial judge abused her discretion by denying his mistrial motion. It is undisputed that the reason for the delay in this trial—emergency orders shutting down the courthouse due to the COVID-19 pandemic—was good cause for the continuance. That exceptionally strong showing of good cause distinguishes this case from the authority defendant cites. And, defendant has not shown he was actually

6

prejudiced from the delay. Therefore, we must conclude the trial judge did not abuse her discretion.

### 1. Additional background.

During pretrial proceedings, the trial judge addressed her concern about obtaining sufficient jurors due to the COVID-19 pandemic. Later, after excusing a sworn, elderly juror who had asked to be excused because she suffered from asthma, the judge stated, "We're still waiting on any kind of information from the presiding judge as to whether or not we're going to go forward and continue holding hearings pending the coronavirus epidemic." However, the judge indicated she and the attorneys had agreed to "go forward until we hear otherwise." The courtroom deputy had inquired whether the alternate jurors had "any concerns." The trial judge indicated that an elderly alternate juror had responded, "[H]e's good to go." And, just before the attorneys made their opening statements, the trial judge stated, "I have not received any kind of information, yet, from my presiding judge about any changes to the people who are, in fact, in trial. I'll be updated throughout the time and as soon as I get updates, I'll give you updates, as well. As far as I'm concerned, at this juncture, we're going forward."

Five witnesses testified for the prosecution on March 16, 2020, the first day of evidence. That afternoon, the presiding judge (with the agreement of the Chief Justice) announced that the Rancho Cucamonga courthouse, where the trial was being held, would be "completely shut down" because of the COVID-19 pandemic. The trial judge indicated the order was set to expire on April 2, but the attorneys agreed to resume trial on April 6 with an estimated completion date of April 20. One juror expressed the concern that April

7

6 might be the season home opening day for the Los Angeles Dodgers, but no jurors said they were concerned for their health or safety. Therefore, the trial judge continued the case to April 6. The judge admonished the jurors "not to discuss or form or express an opinion until the cause is finally submitted to you. Don't talk about the case with anyone."

On March 23, 2020, the Chief Justice issued an emergency order suspending and continuing all jury trials for 60 days unless good cause was shown that trials could be safely resumed sooner using remote technology. (See *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164, 167.) The trial judge continued the case to May 11 and then again to May 18.

On May 18, the trial judge expressly found there had been good cause for the continuances "due to the COVID-19 orders that came from the California Supreme Court and, of course, the presiding judge, as well." Defendant moved for a mistrial, arguing, inter alia, he could not receive a fair trial because social distancing rules and the use of masks by witnesses would hinder the jury's ability to judge the credibility of witnesses, jurors would be preoccupied with their (and their family's) safety and not on the task of carefully considering the evidence, and he would be prejudiced because the jury would have difficulty recalling the testimony presented two months earlier.

The trial judge denied the motion. She indicated both parties had the opportunity to present opening statements before the trial was continued, and the prosecutor had only presented the testimony of five witnesses. The defendant had the opportunity to cross-examine those witnesses, so the jury had been able to hear the defense's perspective

8

before the continuance. If the jurors were unable to recall the testimony from the first day of evidence, "they'll be able to have readback of the testimony, which . . . would cure any defect in terms of passage of time." Because the testimony presented so far had been "rather brief," and the jury would have the opportunity to have it read back to them during deliberations, the judge found the defendant's due process right to a fair trial had not been violated. Likewise, the judge rejected defendant's assertion that his right to a fair trial would be violated because social distancing and masks would impede the jury's ability to judge the credibility of witnesses.

When discussing the willingness of jurors to return, and the possible need to seat alternate jurors, the trial judge indicated only one juror had asked to be excused because she could not leave her family. The courtroom deputies had reported, "there was no hesitation, whatsoever, or fears of any of the [other] jurors in returning to this court." The judge noted that, except for the juror who had asked to be excused, the jury was "very anxious and desirous to come back, indicating no fears, whatsoever." Therefore, the judge found the jury was "very willing, very capable, and they're not going to have any fears of having to wear a mask or social distance to prevent them from doing their obligation and duty as jurors, including focusing on the witnesses."

The trial judge also stated she saw no need to individually question the jurors, though she would wait to see how other judges in the court were handling the situation. Instead, the judge suggested she would admonish the jury "en mass" about its duty to concentrate on the facts and to decide the case based solely on the evidence and the judge's instructions. Defense counsel requested the jurors be questioned individually

9

because "in a group setting[] jurors may not be completely forthright" or "openly candid," and individual questioning would give the court the chance to ask follow-up questions if needed. The judge took the request under submission but restated her belief that "a general admonition would be sufficient."

The next day, May 19, the trial judge ruled she would not question the jurors individually "as to whether or not they feel the COVID-19 virus fear will preclude them from following their basic functions and duties." The judge indicated she believed the jurors understood "there's an open line of communication, and that in all of the calls we have made since the recess, they all have indicated that they're willing to come back, they're anxious to get back, want to come back, and not in any phone conversation [did] they bring up a COVID-19 fear, whatsoever." Moreover, the judge noted the jury had been told before opening statements that an elderly juror had been excused because of her concerns over COVID-19, "[s]o they do have a full understanding that there's always an open line of communication between themselves and the Court that if they felt anything would preclude them from their services in this case, for any reason, [they could] bring it to our attention."

After she explained to the jurors the safety measures that had been undertaken during the continuance (multiple deep cleanings of the courtroom and the addition of air filters), the trial judge stated, "[T]he bottom line is that we want to make sure you're all good to go. You have to understand that your function as jurors is to concentrate on the witnesses, judge their credibility, determine what the facts are, and see how it applies to the law. We're at a different new normal right now, and so I want to make sure that none of

you have any concerns or would think that the absence, the recess, the pandemic would preclude you from your service in this case in any way and take away from your basic functions and duties." The judge then asked the jurors, as a group, "Does anybody feel that way? You understand that you have to be fair to all parties? And that you're the same person you were when we chose you as a juror and when you've come back. Everybody agree to that?" In unison, the jury answered, "Yes." The judge then told the jury to write a note to the bailiff if they had "any concern or suggestions."

In her instructions to the jury after the close of evidence, the trial judge once more reminded the jury of its duty to decide the case based solely on the evidence and the law, and not be influenced by outside factors such as bias, sympathy, prejudice, or public opinion. The jurors were told not to consult the Internet, dictionaries, or other sources of information. The judge also instructed the jury that it could ask to have testimony read back to it. While deliberating, the jury requested a readback of the testimony of M.K., the first witness who testified for the People.

Before sentencing, defendant moved for a new trial arguing he was prejudiced by the midtrial continuance. The trial judge denied the motion for the same reasons she had denied the earlier mistrial motion. The judge rejected the defendant's suggestion that the length of the delay made it practically impossible for the jurors to keep an open mind. Nor was the judge convinced that "the COVID situation" prevented the jurors from being fair and undistracted. "I made it very clear to the jurors at any time they could bring to my attention any issues that they felt that—based on the COVID pandemic, uniqueness of the trial that would affect them in any way, to bring it to my attention." In addition, the judge

11

indicated the juror's ability to judge the demeanor and credibility of witnesses had not been impaired because all the witnesses chose to testify without wearing a mask. Finally, because "the bulk of the testimony" was introduced after the trial had resumed, "the bulk of the trial was fresh in the mind [of the jurors] during the course of the deliberation process."

### 2. *Applicable law.*

"The denial of a motion for a mistrial is generally reviewed for abuse of discretion." (*People v. Peterson* (2020) 10 Cal.5th 409, 467.) "A trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction' [citation]. 'Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'" (*People v. Avila* (2006) 38 Cal.4th 491, 573.)

Continuances in criminal cases "shall be granted only upon a showing of good cause." (§ 1050, subd. (e).) The same standard applied to midtrial continuances. (*People v. Winbush* (2017) 2 Cal.5th 402, 469 ["A midtrial continuance may be granted only for good cause."].) "Although most cases exploring what constitutes good cause involve continuances requested by a party, the good cause requirement is equally applicable to a midtrial continuance or delay occasioned by the trial court itself. Just as the court cannot grant a party's motion to continue without a showing of good cause, it cannot order a

12

continuance on its own motion without good cause." (*People v. Santamaria* (1991) 229 Cal.App.3d 269, 277 (*Santamaria*).)

"A trial court has broad discretion to grant or deny continuances." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 508.) The trial court's determination that good cause existed to continue the trial is reviewed for abuse of discretion. (*People v. Sutton* (2010) 48 Cal.4th 533, 546.) In determining whether good cause existed, "the reviewing court examines the specific circumstances, including the benefits and burdens of postponing a trial that is already underway." (*People v. Garcia* (2011) 52 Cal.4th 706, 758; accord, *People v. Fudge* (1994) 7 Cal.4th 1075, 1105.)

  *3. Analysis.*

Relying on *U.S. v. Hay* (9th Cir. 1997) 122 F.3d 1233 (*Hay*), *Santamaria*, *supra*, 229 Cal.App.3d 269, and *People v. Engleman* (1981) 116 Cal.App.3d Supp. 14 (*Engleman*), defendant argues the 63-day midtrial continuance, in this case, was

13

"unprecedented" and the trial court abused its discretion by denying his mistrial motions.[3]

Those cases are easily distinguished for one fundamental reason—in all three, there was no good cause to support the continuance. (See *People v. Breceda* (Mar. 9, 2022, G059322) ___ Cal.App.5th ___ [2022 Cal.App. Lexis 194, *41-*44] [inter alia, distinguishing *Santamaria*, *Engelman*, and *Hay* because in all three there was no good cause for a midtrial continuance].)

In *Hay*, the district court continued a trial after the close of evidence for 48 days to accommodate jurors' summer vacation schedules and resumed with closing statements and juror deliberations. (*Hay*, *supra*, 122 F.3d at p. 1235.) The opinion by the Ninth

---

[3] The People fault defendant for not also addressing the decision in *People v. Gopal* (1985) 171 Cal.App.3d 524 (*Gopal*). The defendant in that case challenged a 10-week midtrial continuance based on court congestion. As the Court of Appeal indicated, "[T]he full resources of the Santa Clara Superior Court were devoted to the handling of criminal matters, . . . the retired judges pressed into service had been assigned following a request to the Judicial Council pursuant to section 1050," and "[t]he trial court expressly found that 'the continuances of the trial of the defendant were caused by a series of calendar problems and crises coupled with the unforeseen length of this action.'" (*Gopal*, at p. 546.)

The courts have long held that delay caused by court congestion is good cause to continue a trial date beyond the time limits prescribed by section 1382 only if "exceptional circumstances" are present. (*Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 781-782; see *People v. Johnson* (1980) 26 Cal.3d 557, 570.) Although the defendant in *Gopal* had been timely brought to trial for purposes of section 1382, the Court of Appeal relied on that line of cases to hold there had been good cause for the midtrial continuance based on "exceptional circumstances." (*Gopal*, *supra*, 171 Cal.App.3d at p. 546.) Noting the absence of "any contradictory declarations or evidence offered by appellant," the Court of Appeal held "there was a sufficient showing that good cause existed for the prolonged recesses . . . ." (*Ibid*.)

Because the midtrial continuance in this case was not the result of court congestion or the lack of judicial resources to complete the trial without interruption, *Gopal* and the line of authority it relied upon are not particularly helpful.

Circuit Court of Appeals[4] is completely silent about whether the trial court had found good cause to continue the trial, and the reviewing court did not expressly state it found no good cause. However, by ruling the trial court should have proceeded with the trial because (1) "the trial was nearly over by the time that the recess was called," (2) the trial could have proceeded with less than 12 jurors pursuant to the parties' stipulation, and (3) the length of the continuance was unprecedented, the reviewing court implicitly found good cause was completely lacking. (*Id.* at pp. 1235-1236.)

The trial court in *Santamaria* continued a trial for 11 days after the jury had already begun deliberating because the trial judge "'was to be away.'" (*Santamaria*, *supra*, 229 Cal.App.3d at pp. 274-276.) The Court of Appeal expressly found an "absence of good cause" to support the continuance. (*Id.* at p. 277.) "The record in the present case discloses no administrative duties, congested calendar, or any other exceptional circumstances to explain the continuance; instead, the record indicates only that the judge was to be 'away,' and that at least two of the days involved were holidays. If there was any established necessity for the delay, it is not apparent from this record." (*Ibid.*)

Finally, in *Engleman*, the former appellate department of the Superior Court of Los Angeles County[5] held the trial court erred by denying the defendant's pretrial motion to

---

[4] "We are, of course, not bound by the decisions of lower federal courts . . . ." (*People v. Gray* (2005) 37 Cal.4th 168, 226 (*Gray*) [distinguishing *Hay*, *supra*, 122 F.3d 1233].)

[5] Although decisions of the appellate division and former appellate department of the superior court may have persuasive value, "they are of debatable strength as precedents and are not binding on higher reviewing courts." (*Velasquez v. Superior Court* (2014) 227 Cal.App.4th 1471, 1477, fn. 7.)

suppress evidence (the results of a breath test) and that the defendant was entitled to a retrial. (*Engleman*, *supra*, 116 Cal.App.3d at pp. Supp. 18-20.) The court also held (arguably in dicta) that the defendant's right to a fair trial had been violated when, after the prosecution had rested, the visiting judge who was presiding over the case continued the trial for three weeks so he could return to his "'home court.'" (*Id*. at p. Supp. 20.) Although the appellate department did not expressly state it found no good cause to support the continuance, like the court in *Hay*, it implicitly did so. For instance, the appellate department indicated the visiting judge had not utilized an available alternative to a continuance by complying with section 1053 and either have the "the other judge" in the judicial district complete the trial or notify the Chairperson of the Judicial Council of his inability to continue uninterruptedly trying the case so another visiting judge could be assigned. (*Engleman*, at p. Supp. 20.)

In marked contrast, the trial judge here expressly found that good cause existed for the continuance because of the Chief Justice and the presiding judge's emergency orders. And, defendant expressly concedes the COVID-19 pandemic did, in fact, constitute good cause for the continuance. As he states, "The pandemic was an act of nature and there were no alternatives but to shut the courtroom down."

A recent decision affirming a 90-day continuance of a trial date due to COVID-19 is instructive. "Health quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date. In *In re Venable* (1927) 86 Cal.App. 585 . . . , the appellate court upheld the continuation of trial beyond the statutory limit when from the 'first to the middle of September,' an 'epidemic of infantile paralysis

16

was prevalent in the town wherein the sessions of the justice's court were held[,] and for that reason no juries were called during that period.' (*Id*. at p. 587.)  More recently, in *People v. Tucker* (2011) 196 Cal.App.4th 1313 . . . , the court upheld a one-week delay to commence a trial when the defendant was in custody at a correctional facility that was under quarantine because a prisoner had contracted the H1N1 flu virus.  (*Id*. at pp. 1315, 1318.)  'A contrary holding would require trial court personnel, jurors, and witnesses to be exposed to debilitating and perhaps life-threatening illness.  Public health concerns trump the right to a speedy trial.' (*Id* at p. 1314.)" (*Stanley v. Superior Court*, *supra*, 50 Cal.App.5th at p. 169.)

"Although the 90-day continuance here [was] far longer than the continuances in *Venable* and *Tucker*," the *Stanley* court held "the COVID-19 pandemic is of such severity as to justify a continuance of this length." (*Stanley v. Superior Court*, *supra*, 50 Cal.App.5th at p. 169.)  Given the severity of the pandemic in the United States at the time the reviewing court issued its opinion (as of June 9, 2020, two million infections and more than 110,000 deaths), the court held "the trial court unquestionably was justified in finding that the COVID-19 pandemic constitutes good cause to continue defendant's trial until July 13, 2020, with a statutory deadline of July 29.  Given the grave risks to court personnel, jurors, attorneys, and the defendant himself that would be created by proceeding in accordance with the normal timeline, any other conclusion would have been unreasonable in the extreme.  While we acknowledge the unfortunate hardship to the defendant from this delay, neither the prosecution nor the court are responsible for the emergency that has overwhelmed the nation and much of the world, and at this time,

17

'[p]ublic health concerns trump the right to a speedy trial.' (*People v. Tucker*, *supra*, 196 Cal.App.4th at p. 1314.)" (*Stanley v. Superior Court*, at p. 170.)

Even more recently, our colleagues in Division Three of this appellate district affirmed the denial of mistrial motions after the trial court was forced to continue an ongoing criminal trial for even longer than in this case. After the prosecution had almost completed its case-in-chief, the trial court paused the proceedings because one seated juror and two alternate jurors became infected with the COVID-19 virus. The defendant refused to waive time or consent to proceed with only 11 jurors, and the trial court denied his first mistrial motion. Various orders closing the courthouse to jury trials because of the pandemic resulted in the trial not resuming for 72 days. The defendant once more moved for a mistrial, which the trial court denied. (See *People v. Breceda*, *supra*, ___ Cal.App.5th ___ [2022 Cal.App. Lexis 194, *11-*20].)

As in *Stanley v. Superior Court*, *supra*, 50 Cal.App.5th 164, the *Breceda* court noted, "Health quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date." (*People v. Breceda*, *supra*, ___ Cal.App.5th ___ [2022 Cal.App. Lexis 194, *32].) And, as in this case, the defendant there did not argue "good cause was lacking." (*Id*. at p. *34.) The reviewing court held the trial court had no choice but to continue the trial and did not abuse its discretion by denying the defendant's mistrial motions. (*Id*. at pp. *34-*45.)

Nonetheless, defendant—with special emphasis on *Hay*, *supra*, 122 F.3d 1233 and *Engleman*, *supra*, 116 Cal.App.3d Supp. 14—argues the trial judge abused her discretion by denying his mistrial motion "based on the stage of the trial when the separation began

18

and the number of days that passed before [his] trial resumed." True, those courts found the defendant had been prejudiced because of the timing and duration of the continuance. (*Hay*, at p. 1236; *Engleman*, at pp. Supp. 20-21.) But, to repeat, those courts implicitly found there had been no good cause whatsoever to justify the continuances in the first place, so they had no occasion to balance the strength of the showing of good cause against the potential for harm to the defendant. Here, the showing of good cause was exceptionally strong. (See *Stanley v. Superior Court*, *supra*, 50 Cal.App.5th at pp. 169-170.)

Moreover, defendant has not demonstrated he was actually prejudiced by the midtrial continuance. In *Hay*, the trial court continued the trial after the jury had heard all the evidence on which it would deliberate, and the reviewing court believed there was a real possibility the jury would have difficulty recalling the evidence. (*Hay*, *supra*, 122 F.3d at p. 1236 ["The jury could not be expected to adjourn this late in the case for a month and a half without forgetting any of the relevant evidence."].) And in *Santamaria*, the trial court continued the trial at "the most critical period in a trial"—after all the evidence had been presented, the parties had presented closing arguments, and the jury had been instructed and begun deliberations. (*Santamaria*, *supra*, 229 Cal.App.3d at p. 281.) Both reviewing courts recognized the general rule that a defendant must demonstrate actual prejudice from a midtrial continuance, but they concluded the delays at issue were prejudicial per se and that the defendants did not need to show actual prejudice. (*Hay*, at p. 1236; *Santamaria*, at pp. 279-283.)

In contrast, in *Gray*, *supra*, 37 Cal.4th 168, our Supreme Court rejected a challenge to 338-day delay between the verdict in the guilt phase and the start of the penalty phase in a capital case in large part because, not only was there good cause for the delay (the proceedings were stayed while the defendant himself pursued appellate remedies), but the defendant could not prove he was actually prejudiced by the delay. (*Id*. at pp. 226-231.) And, in *People v. Breceda*, *supra*, ___ Cal.App.5th ___ [2022 Cal.App. Lexis 194], the Court of Appeal expressly rejected the rule of inherent prejudice set forth in *Engleman* and *Hay*. Instead, assuming for the purpose of argument the trial court had erred when it denied the defendant's mistrial motions, the court held the error was subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 and that the defendant had not shown he was prejudiced. (*Breceda*, at pp. *45-*52.)

Here, the continuance took place after five witnesses for the People had testified. The jury heard testimony from the remainder of the People's witnesses and the defense case—what the trial judge characterized as "the bulk" of the case—*after* the trial resumed. In other words, unlike in *Engleman*, the jury here had not heard the entirety of the prosecution's case before the continuance, so it would not have necessarily "determine[d] the case before hearing both sides." (*Engleman*, *supra*, 116 Cal.App.3d at p. Supp. 21.) Nor may we assume defendant was prejudiced by the jury not remembering the testimony that had been presented before the continuance. Both the trial judge and the prosecutor told the jurors they could request that testimony be read back to them during their deliberations, and the jury did request to rehear the testimony of M.K.

20

And, importantly, the verdict itself supports a strong inference that the jury had not made its mind up before the continuance. The People tried the case on the theory of premeditated first degree murder. But, by returning a verdict of *second* degree murder, it is clear the jury carefully considered all the evidence, including the defense case, by concluding defendant acted with provocation or he was voluntarily intoxicated and/or mentally impaired such that he could not form the specific intent to kill.

In sum, we conclude the trial judge correctly denied defendant's mistrial motion because there was ample good cause to support the midtrial continuance and defendant has not shown he was prejudiced by it.

B.      *The Trial Court Did Not Abuse Its Discretion by Declining to Individually Question Jurors Before Resuming the Trial.*

Last, we reject defendant's claim that the trial judge abused her discretion by declining to individually question the jurors about their health or safety concerns with resuming the trial. Defendant argues that, given the extreme uncertainty and widespread fear during the early stages of the COVID-19 pandemic, it is highly likely (if not certain) that jurors in his case had concerns for their personal safety or about serving on a jury when they should instead be tending to the safety of their families. He also argues the jurors might have been more willing to express those concerns to the trial judge had they been questioned individually, and the judge abused her discretion by merely questioning the jury as a group.

In *People v. Stanley* (1995) 10 Cal.4th 764, an issue arose about a capital defendant's competency during the penalty phase after the People had presented its case

21

and while the defense was presenting its case, and the trial court suspended the proceedings and conducted a competency trial. (*Id*. at pp. 801-803.) On appeal, the defendant argued the more than three-month hiatus in the penalty phase "created a significant risk the penalty phase jurors would be exposed to prejudicial extraneous information about the case," and "the trial court erred in refusing his request that each member of the jury be questioned as to whether anything had occurred during the interruption that would interfere with his or her ability to continue as a fair and impartial juror." (*Id*. at p. 836.) Although the defendant acknowledged that normally a defendant bears the burden of establishing jury misconduct, he argued the length of the delay "should raise a presumption [the] jurors were exposed to improper material, thereby obviating the need for a specific showing of misconduct." (*Ibid*.) The court declined to adopt such a rule. (*Ibid.*) "During the trial, the trial court admonished the jurors each evening to avoid discussing the case, forming or expressing any opinion on it, or reading or listening to anything connected with the case that might appear in the news media. Just before the hiatus, the court gave a particularly strong admonition . . . . In the absence of any contrary showing, we presume the jurors followed the admonition." (*Id*. at pp. 836-837.)

As in *People v Stanley*, *supra*, 10 Cal.4th at p. 836, we decline to adopt a rule that the length of the delay in this trial creates a presumption that the jurors were exposed to improper influences (the stress and fear of COVID-19 infection), such that the trial judge was required to individually question the jurors before resuming the trial. Here, the judge clearly and consistently instructed the jury to limit itself to the evidence presented and to

not form opinions about the case based on outside information or factors. We must presume the jury followed those admonitions. (*Id*. at p. 837.) Before resuming the trial, the trial judge placed on the record the fact that, except for one juror who asked to be dismissed, the remaining jurors were "anxious and desirous" to continue with the trial and had expressed no concerns for their safety. When asked if they had any concerns with proceeding, the jurors stated, in unison, they did not. And, the judge emphasized to the jurors they should feel comfortable communicating to the court any concerns that may arise. Under those circumstances, we simply cannot say the trial judge abused her discretion by declining to individually question the jurors.

IV.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER

Acting P. J.

We concur:

MILLER

J.

CODRINGTON

J.

23